[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 09-10806

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
APRIL 6, 2010
JOHN LEY
CLERK

D. C. Docket No. 04-02346-CV-GET-1

ELLEN SCHAAF,

Plaintiff-Appellant,

versus

SMITHKLINE BEECHAM CORPORATION,
d.b.a. GlaxoSmithKline,
GLAXOSMITHKLINE,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(April 6, 2010)

Before DUBINA, Chief Judge, BIRCH and BLACK, Circuit Judges.

BLACK, Circuit Judge:

Appellant Ellen Schaaf worked for GlaxoSmithKline as a Regional Vice President, but, after returning from maternity leave, was demoted to District Sales Manager. Schaaf then sued GSK, alleging that her maternity leave impermissibly contributed to her demotion. The district court granted summary judgment on some of her claims and judgment as a matter of law on others, all in favor of GSK. Schaaf appeals these orders; this Court affirms the district court.

## I. BACKGROUND

Schaaf worked for GlaxoSmithKline (GSK) first as a Sales Representative and then as a District Sales Manager (DSM) before assuming the role of Regional Vice President (RVP) in 1999. In her new role as RVP, Schaaf was tasked with overseeing a region that included all of Florida and a portion of southern Georgia—a region that, at the time, had consistently failed to meet GSK's sales expectations. Schaaf's superiors encouraged her to address these shortfalls by approaching the RVP position with creativity and innovation, and indicated that the goal of increasing sales volume in the faltering region was of central importance. After a few years at the helm, the early signs indicated that Schaaf had successfully risen to the challenge; under her direction, the region's performance increased markedly and its sales figures returned to satisfactory levels.

2

Although initial indications seemed positive, problems between Schaaf and her subordinates eventually tainted Schaaf's managerial accomplishments. In July 2002, three DSMs working under Schaaf—Liz Murray, Stewart Miller, and Jose Castrillo—lodged complaints with the GSK Human Resources (HR) department, bemoaning Schaaf's alleged unprofessional management style. HR then interviewed each of these three DSMs, in addition to all of the other GSK employees who reported directly to Schaaf. The other employees verified Murray, Miller, and Castrillo's initial complaints regarding Schaaf's management, and, in some cases, further elaborated on her alleged faults.

The interviews revealed both broad complaints and specific grievances about Schaaf. For example, the employees complained about Schaaf's antagonistic and inflexible management style, chronic inaccessibility, poor communication skills, harsh and demanding demeanor, and tendency to play favorites, as well as about her failure to provide written feedback on performance appraisals, her practice of sharing some DSMs' confidential performance-evaluation information with other employees, her unwillingness to respond to voice-mail messages for weeks at a time, and her failure to acknowledge the contributions of her subordinates. The interviews left no question as to how the DSMs viewed Schaaf as a supervisor. For instance, one employee lamented the

3

"[t]errible" state of the region's morale, explaining, "Morale can't be positive. Just no way. You don't know when she is going to strike. Only thing predictable is that it's going to be nasty . . . ." Another reported that Schaaf was simply "not open to hearing differing viewpoints," and a third starkly described Schaaf as "very cold and uncaring." Schaaf's subordinates reiterated that Schaaf's management defects contributed significantly to the group's low morale.

After these initial interviews with the subordinates, GSK also interviewed Schaaf to offer her a chance to respond to their concerns. GSK then determined that the employees' grievances were severe and pervasive enough to warrant taking formal disciplinary action against Schaaf by issuing her a Verbal Warning. Lisa Gonzalez, Schaaf's immediate superior, also instructed Schaaf to complete a so-called Performance Improvement Plan (PIP) with the goal of bettering her communication skills and management style. According to GSK, the improvement plan was designed to allow Schaaf an opportunity to correct her shortcomings and to foster improved relationships with her subordinates—for instance, the PIP required Schaaf to issue previously uncompleted written performance reviews to her subordinates, to attend management-training programs, and to complete team-building exercises with her subordinates.

Incidentally, in July 2002, the same month that Murray, Miller, and Castrillo first complained to HR, Schaaf informed Gonzalez, her superior, that Schaaf was pregnant with her fourth child and planned to take maternity leave beginning in early 2003.[1]  As a result, Schaaf expressed some concern regarding her ability to complete the PIP prior to the commencement of her leave.  Rather than making a diligent attempt to satisfy the plan's requirements and to demonstrate her willingness to improve herself professionally, however, Schaaf instead ignored several PIP deadlines, including deadlines to register for the required management courses and to complete the written performance evaluations.  Schaaf even failed to meet the deadline for simply returning a signed copy of the plan to her superiors.  As a result of this demonstrated unwillingness to cooperate, Schaaf did not satisfy the PIP's requirements by the target date of December 5, 2002.  Gonzalez then extended this time frame until mid-January 2003, and, when Schaaf likewise failed to meet this new deadline, Gonzalez extended it again until after Schaaf returned from her maternity leave.

Schaaf began her leave on January 21, 2003.  During her absence, an interim RVP took her place, and the subordinates reported that the region

---

[1] Despite the temporal proximity of these events, there is nothing in the record indicating that any of Schaaf's subordinates knew either that Schaaf was pregnant at the time or that she planned to take leave a few months later.

5

functioned significantly better while Schaaf was gone. While serving as RVP, the interim also discovered and corrected several significant administrative problems that had occurred under Schaaf's watch, including scores of expense reports that Schaaf had ignored and several invoices from outside creditors that Schaaf had failed to pay. The subordinates reported that, under the interim RVP, productivity had increased, communication had improved, and morale was markedly higher.

Shortly before Schaaf's return, the DSMs requested a meeting with Gonzalez, Schaaf's superior, to express their concerns that the region's increased morale and productivity could dissipate immediately if Schaaf resumed her role as RVP. Gonzalez took these reservations seriously: when Schaaf returned to work on April 15, 2003, she was immediately instructed to travel to Gonzalez's office in North Carolina. Once there, Gonzalez gave Schaaf a choice: she could either accept a demotion to District Sales Manager or leave the company, but in any case she would not be reinstalled as RVP. Schaaf eventually accepted the demotion to DSM, and submitted a request for a written statement of the reasons for her demotion.

GSK provided the requested written response, in which it informed Schaaf that her subordinates had complained of her overbearing and hostile management style and that her region functioned markedly better in her absence. GSK also

6

indicated that Schaaf's failure to complete the PIP requirements and her demonstrated unwillingness to change her management behavior contributed to her demotion. Schaaf then sued, claiming that GSK impermissibly demoted her for reasons related to her statutorily protected maternity leave.

## II. DISCUSSION

Schaaf raises a number of issues on appeal, but her primary arguments center on whether GSK violated Schaaf's rights under the Family and Medical Leave Act (FMLA). Schaaf alleges that GSK violated the statute both by (1) interfering with her FMLA rights and (2) retaliating against her for exercising those rights.

The district court granted judgment as a matter of law in GSK's favor on both of these claims. On appeal, this Court reviews that grant de novo, and it draws all reasonable inferences in favor of Schaaf, the nonmoving party. *See Rossbach v. City of Miami*, 371 F.3d 1354, 1356 (11th Cir. 2004). The standards set forth by Federal Rule of Civil Procedure 50 guide the de novo evaluation; that rule permits a court to "grant a motion for judgment as a matter of law against [a] party" if it "finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50. Granting such a motion is proper when "the facts and inferences point overwhelmingly in

favor of one party, such that reasonable people could not arrive at a contrary verdict." *Carter v. City of Miami*, 870 F.2d 578, 581 (11th Cir. 1989).

While Rule 50 provides the legal standards for determining whether judgment as a matter of law was appropriate in this case, the FMLA provides the substantive law under which this Court evaluates Schaaf's allegations. The statute's purpose, among others, is to provide employees with the flexibility needed to care for a newborn child. To this end, the statute affords eligible workers up to twelve weeks of unpaid leave per year to attend to the birth and care of the new child. 29 U.S.C. § 2612(a)(1)(A); *Martin v. Brevard County Pub. Sch.*, 543 F.3d 1261, 1265 (11th Cir. 2008). Then, when an employee returns from leave, the FMLA requires that the employer reinstate that employee to the position she held when her leave began, or to another position that is equivalent in terms of benefits, pay, and other relevant conditions of employment. § 2614(a)(1); *Martin*, 543 F.3d at 1267.

Importantly, however, this reinstatement right is not absolute; rather, "an employer can deny reinstatement if it can demonstrate that it would have discharged the employee had [s]he not been on FMLA leave." *Martin*, 543 F.3d at 1267 (quotations omitted). But, if an employee is not reinstated, the employer bears the burden of proving that the employee was discharged for independent

8

reasons that were unrelated to the employee's leave. *Parris v. Miami Herald Publ'g Co.*, 216 F.3d 1298, 1301 n.1 (11th Cir. 2000).

## A. FMLA Interference Claim

Schaaf's two FMLA claims are similar, as both involve GSK's decision to demote her upon her return from FMLA-protected leave. In her first claim, Schaaf casts her demotion as interference with—that is, denial of—her FMLA rights: the FMLA entitled Schaaf to reinstatement upon her return, and she was not reinstated.

To succeed under this interference theory, Schaaf must demonstrate only that she was "denied a benefit to which [s]he was entitled under the FMLA." *Martin*, 543 F.3d at 1266–67. Schaaf maintains that she successfully made this showing by proving that she was demoted upon her return from maternity leave, thereby establishing that GSK denied her the benefit of reinstatement to which she was entitled. GSK, on the other hand, contends that it demoted Schaaf for independent performance-related reasons, and that, consequently, it did not violate the FMLA.

Neither party disputes that Schaaf made a prima facie showing of an FMLA interference claim, in that she demonstrated she was not reinstated to the same position she held prior to taking her FMLA leave. Thus, the crux of this issue is

9

whether GSK proved to a legal certainty that Schaaf was demoted for reasons unrelated to her FMLA leave, such that she would have been demoted even if she had not taken leave. *See Martin*, 543 F.3d at 1267. Because GSK offered evidence showing that Schaaf was demoted as a result of her ineffective management style, and Schaaf does not offer any evidence to the contrary, the district court did not err in granting GSK's motion for judgment as a matter of law.

Essentially, Schaaf's arguments rely on one basic premise: because GSK learned of Schaaf's hostile temperament, ineffective management practices, and administrative ineptitude while she was on leave, it follows that GSK would not have discovered these derelictions had Schaaf *not* taken maternity leave. Thus, Schaaf concludes, her maternity leave *caused* her demotion because, but for the leave, GSK would have had no reason to demote her.[2]

This argument, however, is legally incorrect and logically unsound. In an FMLA interference case, courts examine not whether the FMLA leave was the *but-for* cause of an employee's discharge or demotion, but rather whether it was the *proximate* cause. Although this Court has not yet had occasion to address the familiar distinction between but-for and proximate causation in the FMLA

---

[2] Schaaf uses this very language to make her argument; for instance, in her Reply Brief, Schaaf asserts, "[A] jury could find that but-for Ms. Schaaf's leave, she would not have been demoted." Schaaf reiterated this position at oral argument.

10

context, a brief examination of the statute's purpose readily illustrates the flaw in Schaaf's position.

The purpose of the FMLA is to allow individuals to temporarily put their careers on hold in order to tend to certain personal matters, like the care of a newborn child. Its purpose is not to aid an employee in covering up her work-related deficiencies. If an employee were demoted or discharged *for the reason that* she took an FMLA leave, individuals would then be reluctant to take leave to care for their new children. Thus, because the statute's purpose would have been frustrated, it follows that the employee should be able to sue for FMLA interference and recover damages against the employer. Such a suit also would have the ancillary benefit of helping to deter other impermissible demotions and discharges in the future.

On the other hand, the statute's purpose is not implicated in the least if an employee's absence permits her employer to discover past professional transgressions that then lead to an adverse employment action against the employee. In such a situation, the employer is motivated not by the taking of the leave itself, but rather by prior deficiencies that, whenever they were discovered, would have prompted demotion or discharge whether or not the employee took FMLA leave. Moreover, future individuals who seek FMLA leave would have no

11

reason to fear demotion or discharge upon their return, unless they, too, had been professionally deficient.

Other courts have likewise recognized this distinction. For instance, in a Seventh Circuit case an employer discovered deficiencies in an employee's work while the employee was on FMLA leave. *Kohls v. Beverly Enters. Wis., Inc.*, 259 F.3d 799, 806 (7th Cir. 2001). That court explained, "The fact that the leave permitted the employer to discover the problems can not logically be a bar to the employer's ability to fire the deficient employee." *Id.* There, like here, that the FMLA leave allowed the employer to uncover prior deficiencies does not mean that the employee was fired *because of* the FMLA leave.

The district court for the Northern District of Georgia has applied similar logic. *See Wu v. Se.-Atl. Beverage Corp.*, 321 F. Supp. 2d 1317 (N.D. Ga. 2004). In *Wu*, the district court explained, "[T]he fact that plaintiff's leave is what permitted [the employer] to discover the problems with plaintiff's work performance is of no consequence. Although one could say that plaintiff might not have been demoted if he had not taken leave (at least not at that time), the leave was not the proximate cause of the demotion." *Id.* at 1341.

This distinction between but-for and proximate causation makes good sense in the FMLA context. Holding that but-for causation is somehow sufficient to

support an FMLA claim would permit wanton abuse of the FMLA with perverse consequences. For instance, Schaaf's suggested reading of the statute would effectively protect deficient employees from adverse employment actions, such that those workers could actually attain job security by seeking leave under the FMLA. These employees could take leave and actually *hope* their employers uncover evidence of their transgressions while they are away. If such evidence were revealed, the statute would prevent their employer from *ever* taking adverse action against them, as the leave would *always* be the but-for cause of the discovery of that evidence. Such a laughable result is not supported by policy, by common sense, or, most importantly, by the statute itself.

Here, the evidence shows that Schaaf was demoted because of managerial ineffectiveness that revealed itself in full only in her absence; she was not demoted because (i.e. *for the reason that*) she took FMLA leave. It does not appear that Schaaf presented the district court with any evidence to the contrary, and she does not identify any in her appellate briefs. Accordingly, because "a reasonable jury would not have a legally sufficient evidentiary basis to find" that Schaaf was demoted because she took FMLA leave, *see* Fed. R. Civ. P. 50, the district court did not err in granting judgment as a matter of law in favor of GSK on Schaaf's FMLA interference claim.

13

*B. FMLA Retaliation Claim*

Schaaf's second claim likewise centers on the demotion that immediately followed her return from leave. Under this alternate theory, Schaaf casts her demotion not as interference with her FMLA rights, but rather as retaliation for exercising those statutory rights. In essence, Schaaf alleges that she took leave—an activity protected by the statute—and that she was demoted as a result.

To succeed under this retaliation theory, Schaaf must show that GSK intentionally "discriminated against [her] because [s]he engaged in activity protected by the Act." *Strickland v. Water Works & Sewer Bd. of Birmingham*, 239 F.3d 1199, 1206 (11th Cir. 2001). Essentially, Schaaf must show that she suffered an adverse employment action that was "motivated by an impermissible retaliatory or discriminatory animus." *Id.* at 1207.

In an FMLA retaliation case, unless there is direct evidence of the employer's retaliatory intent, this Court employs the burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817 (1973). *Martin*, 543 F.3d at 1268. Under the *McDonnell Douglas* framework, the plaintiff must first establish a prima facie case by demonstrating (1) she engaged in statutorily protected activity, (2) she suffered an adverse employment decision, and (3) the decision was causally related to the

14

protected activity. *Id.* For the purposes of this analysis, this Court will assume without deciding that Schaaf has successfully established a prima facie case for FMLA retaliation: she has shown (1) she took leave to care for her newborn child, (2) GSK demoted her, and (3) her demotion was temporally proximate to her leave. *See id.* ("[T]he close temporal proximity between [the plaintiff's leave and her termination] . . . is more than sufficient to create a genuine issue of material fact of causal connection.").

Even assuming Schaaf successfully established a prima facie case, however, this assumption satisfies only the first step of the *McDonnell Douglas* framework. Under this burden-shifting analysis, once Schaaf shows a prima facie retaliation claim, the burden then shifts to GSK to articulate a legitimate, nondiscriminatory reason for her demotion. *See id.* A review of the record indicates GSK has readily satisfied this burden: GSK produced testimony regarding Schaaf's poor management practices, astringent leadership style, and inability to communicate effectively with her subordinates. GSK then explained that it learned of these deficiencies while Schaaf was on leave, and accordingly addressed the issue when Schaaf returned. These performance-related factors indicate that Schaaf's demotion was for legitimate reasons unrelated to her FMLA leave; as a result,

15

GSK has satisfied its burden of providing independent, nondiscriminatory bases for the adverse employment action.

Under *McDonnell Douglas*, the burden then shifts back to Schaaf to show that GSK's supposedly independent reasons were, in reality, merely a pretext for discrimination. *Id*. To satisfy this burden, Schaaf must present evidence "sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." *See id.* (quotations omitted). Ultimately, Schaaf has failed to satisfy this burden.

In alleging that GSK's reasons were merely pretextual, Schaaf primarily emphasizes (1) GSK deviated from its disciplinary procedures by demoting Schaaf rather than issuing her a written warning and (2) a jury could have chosen to disbelieve GSK's stated rationale because the company knew of some of Schaaf's deficiencies but nevertheless initially intended to reinstate her as RVP upon her return. None of this evidence, however, demonstrates that GSK's reasons were merely a pretext for discrimination.

First, although evidence that GSK deviated from its ordinary disciplinary procedures may have caused a jury to entertain the possibility of an alternate explanation for Schaaf's demotion, Schaaf offered no evidence that would have

16

allowed a jury to find that there *was* such an alternate explanation.[3]  Schaaf did not

present any evidence suggesting that GSK was motivated by a discriminatory

animus, nor did she offer any evidence showing that GSK's reasons were bad

ones—that is, she did not argue that she was *not* an aggressive, insensitive leader

with poor communication skills.  On the whole, GSK showed that it demoted

Schaaf for purely performance-related reasons and, to the extent it deviated from

its disciplinary procedures, it seems to have done so because of the nature of the

situation.[4]  Even drawing all inferences in favor of Schaaf, there is nothing on

which a reasonable jury could base a finding that GSK demoted Schaaf for

anything other than poor performance.

Schaaf's second argument—that the jury could have disbelieved GSK's

nondiscriminatory rationale because the company knew of some of Schaaf's

deficiencies but initially intended to reinstate her as RVP—is likewise

unpersuasive.  That GSK perhaps intended to reinstate Schaaf before learning of

---

[3] In applying the *McDonnell Douglas* burden-shifting analysis in the context of Title VII employment discrimination, this Court has explained that "merely establishing pretext, without more, is insufficient to support a finding of . . . discrimination.  The plaintiff must show he suffered intentional discrimination because of" a protected ground.  *See Hawkins v. Ceco Corp.*, 883 F.2d 977, 981 n.3 (11th Cir. 1989).  Thus, it is insufficient to show merely that an employer's reasons are pretextual; rather the plaintiff must show that the reasons are a pretext *for discrimination*.  In this case, then, even if Schaaf has successfully cast some doubt on GSK's nondiscriminatory rationale, she did not show that the rationale was a pretext *for discrimination*.

[4] GSK notes that the company's discipline policy specifically provides the flexibility to deviate from the normal procedures if the circumstances so require.

17

the full extent of her ineffective and oppressive management style only bolsters GSK's explanation that the proximate cause of Schaaf's demotion was professional ineffectiveness; it in no way indicates that the demotion constituted impermissible retaliation.[5] Even viewing these events in the light most favorable to Schaaf, there is no contrary inference that a reasonable jury could draw. Accordingly, the district court did not err in granting GSK's motion for judgment as a matter of law on Schaaf's FMLA retaliation claim.

## III. CONCLUSION

Because a reasonable jury would not have a legally sufficient evidentiary basis to find in Schaaf's favor on either of her FMLA claims, the district court did not err in granting GSK's motion for judgment as a matter of law.[6]

**AFFIRMED.**

---

[5] Gonzalez, Schaaf's superior, testified that she initially intended to bring Schaaf back as RVP following her maternity leave, but that her opinion changed after meeting with the DSMs on April 1, 2003. Gonzalez explained, "[My opinion changed] [b]ecause I concluded from the feedback from the managers that Ellen had not shown any change and I didn't think she had any intention of showing any change." This demonstrates not that Gonzalez discriminated against Schaaf, but, rather, that she permissibly credited the feedback of the DSMs regarding Schaaf's professional practices.

[6] Schaaf raises several other issues on appeal, including the disposition of her claims for pregnancy discrimination and discriminatory discipline, as well as a number of rulings on evidentiary and sanctions matters. After reviewing the briefs and having had the benefit of oral argument, this Court holds that these contentions are meritless and it affirms the district court's disposition as to each issue.