[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 10-13533
Non-Argument Calendar

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAY 27, 2011
JOHN LEY
CLERK

D.C. Docket No. 2:09-cv-00575-VEH

J. BROOKS LEACH,

                                                        Plaintiff-Appellant,

versus

STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY,

                                                        Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

(May 27, 2011)

Before HULL, MARCUS and KRAVITCH, Circuit Judges.

PER CURIAM:

J. Brooks Leach appeals the district court's grant of summary judgment to State Farm Mutual Automobile Insurance Company ("State Farm"), his former employer, on his claims of discrimination and retaliation under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq., and interference and retaliation under the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 et seq. After review, we affirm.

## I. BACKGROUND FACTS

Plaintiff Leach worked as an attorney in State Farm's claims litigation department. In late September 2007, Leach advised his Supervisor, Wade Anderson, that he would need to be on leave to care for his wife after her surgery in November, but did not request specific dates.

### A. October 23, 2007 Incident

On October 23, 2007, Leach, who was 61, forwarded a chain email to other State Farm employees relating to the "war on terror." After an email recipient complained, Supervisor Anderson sent Leach an email reminding him that forwarding chain emails was a violation of the code of conduct. Leach responded that the situation was "unbelievable," explained that the chain email was an inspiration and denied violating State Farm's code of conduct. Leach told

2

Supervisor Anderson to forward Leach's response to Claims Section Manager Jay Miller or anyone else appropriate.

What happened next is disputed. According to Supervisor Anderson, shortly after Leach sent his email response, Leach walked by Anderson's office, appeared "extremely angry and aggressive," and told Anderson that he could "shove that up [his] ass." When Supervisor Anderson tried to follow Leach into his office to talk to him, Leach responded that he did not want to talk to him and accused Anderson of harassing him. Leach denied making this statement to Anderson.

Later that day, Supervisor Anderson sent Leach home without pay. According to Leach, Anderson told him he could resign, retire, go home without pay or they could talk. When Leach refused to talk, Anderson told him to leave the office. Shortly afterward, Anderson reported the interaction to his supervisor, David Turner, State Farm's Counsel, and advised that he had sent Leach home without pay.

**B.    Leach Placed on Leave Pending Investigation of October 23 Incident**

The next day (October 24), Plaintiff Leach informed Turner that he intended to take early retirement effective November 7, 2007, the date of his wife's scheduled surgery.

3

However, Leach and his wife were concerned that they would lose their health insurance. On October 29, 2007, Leach sent an email to Turner asking to withdraw his retirement notice. On October 30, Turner accepted the withdrawal and notified Leach he would remain on company-initiated paid leave pending an investigation of the October 23 incident. According to Leach, someone in human resources advised him that he was placed on family medical leave as of October 29, 2007.

## C.    Turner's Investigation

As part of his investigation, Turner asked Anderson to prepare a chronology of Leach's performance issues, which Anderson provided to Turner on October 30. Anderson's chronology recounted incidents from 2005 to 2007 in which Leach was counseled for being unprofessional to opposing counsel, insubordinate to Anderson or hostile to criticism from other State Farm employees. The chronology documented that some of Anderson's performance evaluations had noted Anderson's need to improve his "people skills" and his relationships with other State Farm employees.[1] The chronology included a summary of Anderson's

---

[1]Among other things, Anderson's chronology discussed: (1) a complaint Anderson received in March 2005 from opposing counsel in one of Leach's cases about inappropriate and profane comments Leach had made; (2) Leach's antagonistic response when a State Farm Auto Claims employee voiced dissatisfaction with his handling of her files in October 2005; (3) a July 2006 formal performance counseling based on Leach's initial hostile reaction when Anderson solicited comments from the Auto Claims Department about Leach's work; (4) Leach's

version of the October 23, 2007 incident, but did not make any recommendations as to discipline.

On November 2, 2007, Turner and a human resources representative spoke to Leach by phone to hear his version of the October 23 incident. Leach acknowledged that he probably should not have sent the chain email, but denied passing Anderson's office or making any comment to him. Leach advised Turner of his wife's upcoming surgery and stated that he was also suffering from some medical issues.

On November 12, 2007, Turner submitted his findings to Dean Davis, State Farm's Associate General Counsel. Turner concluded that Leach's version of events was not credible, noting that Leach had been counseled multiple times in the past for insubordination, incivility and lack of professionalism. Turner recommended that Leach be terminated. Because Leach had requested leave to care for his wife, Turner, however, recommended that State Farm "grant him the full allotment of his time off under State Farm's policy for that purpose, and place

"resentment and anger" when Anderson intervened over Leach's secretary's work load; (5) Leach's June 23, 2006 response to Anderson's feedback about Leach's writing in which Leach stated that he was "writing a thesis and Doctoral dissertation when [Anderson was] in Junior High" and that Anderson should "[l]ook up micromanagement and study its effect on the work environment, please"; and (6) an August 2007 complaint from opposing counsel about Leach's lack of civility during a deposition and a scene inspection.

him in an unpaid leave status, making his effective date of termination February 29, 2008." Turner noted that Leach's termination date could be adjusted if Leach did not require the additional medical leave.

## D. Leach's Termination

Associate General Counsel Davis decided that Leach's actions, combined with past counselings for incivility, warranted termination. Davis considered Turner's recommendation and the documentation relating to the October 23 incident and Leach's general performance. Davis agreed with Turner's recommendation to provide Leach with unpaid leave from November 24, 2007 through February 29, 2008, amounting to a total of fourteen weeks, so that Leach could remain on State Farm's health insurance.

On November 12, 2007, Leach's attorney sent State Farm a letter alleging that Leach was being terminated because of his age and suggesting a settlement. Leach's attorney advised that he was authorized to file a charge of discrimination with the EEOC if they were unable to reach an amicable resolution.

On November 20, Leach received a termination letter from Turner advising him that: (1) his employment was being terminated effective February 29, 2008; and (2) he would be placed on unpaid leave of absence from November 24, 2007, until February 29, 2008, so that he could continue his medical insurance coverage

6

and retire on March 1, 2008. Turner's letter explained that Leach was being terminated for "insubordination . . . directed toward [Anderson] on October 23, concerning [his] transmission of an inappropriate email, [his] prior acts of incivility and unprofessionalism toward co-workers, Claims Department employees, and opposing counsel, as well as prior insubordination toward [Anderson]."

## E. Leach's New Employment

On December 18, 2007, Leach accepted a position in Liberty Mutual's claims litigation office. On that same day, Leach emailed State Farm that he would retire effective January 1, 2008. Leach began working for Liberty Mutual on January 2, 2008.

## F. Leach's EEOC Charge

On August 27, 2008, Leach filed a charge of age discrimination with the EEOC. The EEOC dismissed the charge as untimely. According to Leach, he first only suspected his termination was based on his age due to ageist comments Anderson made. When Leach learned in spring 2008 that State Farm had hired a woman in her 20s to replace him, his suspicions were confirmed.

## E. District Court Proceedings

Leach filed this action in district court, alleging that State Farm terminated him because of his age and in retaliation for his opposition to its age discrimination and interfered with and retaliated against him for taking FMLA leave. The district court granted State Farm's motion for summary judgment on all claims.

Specifically, the district court concluded that: (1) the ADEA discrimination and retaliation claims were untimely; (2) Leach abandoned the ADEA retaliation claim and, in any event, Leach had not shown evidence of retaliatory animus; (3) Leach had not shown that State Farm interfered with his FMLA leave and extinguished his right to reinstatement or restoration by retiring and accepting other employment; and (4) Leach failed to show that State Farm's reason for his termination was pretextual, as he received the medical leave and submitted no evidence of retaliatory influence. Leach filed this appeal.[2]

## II. DISCUSSION

A.      **Timeliness of ADEA Claims**

---

[2]We review de novo a district court's order granting summary judgment, applying the same standards as the district court and viewing the facts in the light most favorable to the nonmoving party. Merritt v. Dillard Paper Co., 120 F.3d 1181, 1182, 1184 (11th Cir. 1997). Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986).

Under the ADEA, a plaintiff must exhaust available administrative remedies by filing a charge of unlawful discrimination with the EEOC before filing suit. Bost v. Fed. Express Corp., 372 F.3d 1233, 1238 (11th Cir. 2004); 29 U.S.C. § 626(d)(1). To be timely, the charge must be filed within 180 days after the date of the allegedly unlawful act. 29 U.S.C. § 626(d)(1)(A); Jones v. Dillard's, Inc., 331 F.3d 1259, 1263 (11th Cir. 2003) (explaining that because Alabama is a non-deferral state, ADEA plaintiffs in Alabama must comply with § 626(d)(1)(A)'s 180-day deadline).

The 180-day timing requirement may be equitably tolled if the employee had no reason to believe that he was a victim of unlawful discrimination in the period preceding 180 days before the filing deadline. Turlington v. Atlanta Gas Light Co., 135 F.3d 1428, 1435 (11th Cir. 1998). Equitable tolling is not appropriate if the employee is aware of the discrimination and his legal right to obtain redress. See id. at 1435-36.[3]

Leach does not dispute that he did not file his EEOC charge within 180 days of November 20, 2007, the date he learned of State Farm's decision to terminate his employment. Leach argues that the 180-day period was tolled until he learned

---

[3]Whether equitable tolling applies is a legal question we review de novo, but the district court's factual findings supporting that decision are reviewed for clear error. Miranda v. B & B Cash Grocery Store, Inc., 975 F.2d 1518, 1531 (11th Cir. 1992).

9

that his replacement was woman in her 20s. The problems for Leach are that (1) he was fully aware that State Farm was investigating his conduct, and (2) by November 12, 2007, Leach's attorney wrote a letter to State Farm alleging age discrimination, threatening to file an EEOC charge and attempting to reach a settlement before filing the charge. Under these particular circumstances, equitable tolling is not appropriate.[4] Accordingly, the district court did not err in dismissing Leach's ADEA claims as untimely.

## B. FMLA Claims

Under the FMLA, an eligible employee is entitled to take leave for "a total of 12 workweeks . . . during any 12-month period . . . to care for the spouse . . . of the employee, if such spouse . . . has a serious health condition" or for "a serious health condition that makes the employee unable to perform the functions" of his position. 29 U.S.C. § 2612(a)(1)(C), (D). Following FMLA leave, an employee has the right "to be restored by the employer to the position of employment held by the employee when the leave commenced" or to an equivalent position. Id. § 2614(a)(1).

---

[4]The cases relied upon by Leach are factually distinguishable. These cases involved an employee who had a faint suspicion of age discrimination, but was misled when the employer gave a believable business-related reason for the termination, such as a reorganization, and the employee later learned he or she had actually been replaced by a much younger worker. See Jones, 331 F.3d at 1265-66; Sturniolo v. Sheaffer, Eaton, Inc., 15 F.3d 1023, 1025-26 (11th Cir. 1994).

"Unlike the right to commence leave, an employer can deny the right to reinstatement in certain circumstances . . . ." O'Connor v. PCA Family Health Plan, Inc., 200 F.3d 1349, 1354 (11th Cir. 2000); see also Schaaf v. Smithkline Beecham Corp., 602 F.3d 1236, 1241 (11th Cir. 2010) (stating the "reinstatement right is not absolute"). That is, "[a]n employee has no greater right to reinstatement or to other benefits and conditions of employment than if the employee had been continuously employed during the FMLA leave period." O'Connor, 200 F.3d at 1354.

An employee may raise two types of FMLA claims: (1) interference claims, in which the employee alleges that his employer denied or interfered with an FMLA right, and (2) retaliation claims, in which the employee alleges that his employer discharged or discriminated against him for engaging in a practice protected by the FMLA. 29 U.S.C. § 2615(a)(1), (2). Leach's complaint asserted both types of claims, alleging that State Farm's decision to terminate him while he was on FMLA leave (1) interfered with his FMLA rights and (2) alternatively, was retaliation for exercising his FMLA rights.

1.    Interference Claim

To state an interference claim, the employee need only show that his employer interfered with or denied him an FMLA benefit to which he is entitled.

11

See O'Connor, 200 F.3d at 1353-54.[5] The employee "does not have to allege that his employer intended to deny the right; the employer's motives are irrelevant." Strickland v. Water Works & Sewer Bd., 239 F.3d 1199, 1208 (11th Cir. 2001). However, if, the employee alleges that the employer denied the employee the right to reinstatement following FMLA leave, "the employer has an opportunity to demonstrate it would have discharged the employee even had she not been on FMLA leave." O'Connor, 200 F.3d at 1354 (citing 29 C.F.R. § 825.216(a)); see also Schaaf, 602 F.3d at 1241. If the employer shows it refused to reinstate the employee "for a reason wholly unrelated to FMLA leave, the employer is not liable." Strickland, 239 F.3d at 1208.

Here, it is undisputed that State Farm refused to let Leach return to his former position after his FMLA leave ended. Thus, Leach made a prima facie showing of FMLA interference with his right to reinstatement. See Schaaf, 602 F.3d at 1241 (stating that an FMLA plaintiff "made a prima facie showing of an

_____

[5]On appeal, Leach does not contend that State Farm denied or interfered with his right to commence FMLA leave. Indeed, State Farm placed Leach on FMLA leave when he notified his superiors that he needed to care for his wife while she had surgery. Once the decision to terminate Leach was made, State Farm postponed Leach's termination date to ensure that he was able to take all twelve weeks of his FMLA leave (and then some) and keep his medical benefits during that time.

FMLA interference claim, in that she demonstrated she was not reinstated" to her former position).[6]

The inquiry does not end there. State Farm presented evidence that it refused to reinstate Leach because of his insubordinate and unprofessional conduct toward his supervisor on October 23, 2007 after having been counseled over a two-year period for insubordination, incivility and unprofessionalism. State Farm's reason for refusing to reinstate Leach is wholly unrelated to Leach's FMLA leave. Thus, State Farm's evidence was sufficient to raise its affirmative defense to the interference claim. Indeed, Leach did not present any evidence from which a reasonable jury could conclude that the termination was related in any way to his FMLA leave. Cf. Schaaf, 602 F.3d at 1241, 1243 (affirming district court's entry of judgment as a matter of law where the plaintiff did not present evidence contradicting her employer's reason for demoting her after she returned from FMLA leave).

---

[6]State Farm argues that it did not interfere with Leach's reinstatement right because Leach voluntarily retired from State Farm on January 1, 2008 and went to work for another company before his FMLA leave ended on February 29, 2008. Leach responds that State Farm decided to terminate Leach, i.e., refused to permit him to return to his job after his FMLA leave concluded, on November 19, 2007. Given our ruling that State Farm has established an affirmative defense–that its refusal to resintate Leach was wholly unrelated to his FMLA leave–we need not resolve this issue.

13

Leach points to his testimony that he did not confront Anderson in an angry and aggressive manner and tell him to "shove that up [his] ass." This testimony does not create a material factual dispute because, even if a jury credited Leach's testimony, it would not rebut State Farm's affirmative defense.

Davis made the decision to terminate Leach rather than allow him to return to his position once his FMLA leave expired. Davis based this decision on Turner's investigative findings. Turner reviewed Leach's two-year history of insubordination and incivility at work and, after interviewing Leach, concluded that Leach's version of the October 23 events was not credible. It is a well-settled principle of employment law that in investigating employee misconduct and reaching an employment decision, employers are entitled to make credibility decisions, and our inquiry is limited to whether the employer reasonably believed in good faith that the employee had engaged in misconduct, not whether the employee actually did so. See, e.g., EEOC v. Total Sys. Servs., Inc., 221 F.3d 1171, 1176 (11th Cir. 2000); Damon v. Fleming Supermarkets of Fla., Inc., 196 F.3d 1354, 1361 (11th Cir. 1999). There is no evidence in the record suggesting Davis should have questioned Turner's investigative findings or Anderson's

truthfulness.[7] Therefore, the district court properly granted summary judgment to State Farm on Leach's FMLA interference claim.

**B.     Retaliation Claim**

To state a retaliation claim, the employee must show "that his employer intentionally discriminated against him in the form of an adverse employment action for having exercised an FMLA right." Strickland, 239 F.3d at 1207. While the employer's motives are irrelevant to an interference claim, a retaliation claim carries an "increased burden" to show that the employer's actions were motivated by a retaliatory animus. Id.

When the plaintiff relies on circumstantial evidence to show the employer's retaliatory motive, we apply the familiar McDonnell Douglas burden-shifting framework used to evaluate Title VII retaliation claims.[8] Id. Under this framework, the employee must first present evidence of a prima facie case by showing that: (1) the employee engaged in a statutorily protected activity; (2) the

---

[7]We reject Leach's claim that he presented sufficient evidence to support a jury finding that Davis followed Anderson's biased recommendation under a "cat's paw" theory. See Stimpson v. City of Tuscaloosa, 186 F.3d 1328, 1332 (11th Cir. 1999) (explaining the "cat's paw" theory of discriminatory motive). Not only is there is no evidence that Anderson had an FMLA-related discriminatory or retaliatory animus, there is no evidence that he recommended Leach's termination. Turner, not Anderson, recommended that Leach be terminated. Leach does not claim Turner had the requisite animus and, in any event, there is no evidence to support such a finding.

[8]McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817 (1973).

employee suffered an adverse employment action; and (3) the adverse employment action was causally related to the protected activity. Id. "If the plaintiff makes out a prima facie case, the burden then shifts to the defendant to articulate a legitimate reason for the adverse action." Hurlbert v. St. Mary's Health Care Sys., Inc., 439 F.3d 1286, 1297 (11th Cir. 2006). "If the employer does so, the employee must then show that the employer's proffered reason was pretextual by presenting evidence 'sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision.'" Martin v. Brevard Cnty. Pub. Schs., 543 F.3d 1261, 1268 (11th Cir. 2008) (quoting Hurlbert, 439 F.3d at 1298).

Even assuming arguendo that Leach made out a prima facie case of FMLA retaliation, State Farm has articulated a legitimate, non-retaliatory reason for its decision to terminate Leach. The crux of the appeal is whether Leach presented evidence from which a jury could conclude that State Farm's reason was not the real reason for his termination.

We agree with the district court that Leach did not present sufficient evidence from which a jury could reasonably conclude that State Farm's stated reason was false and that the real reason was Leach's taking of FMLA leave. For the reasons already discussed, the factual dispute about what Leach said and did to

16

Anderson on October 23 does not demonstrate that Davis's reason for terminating Leach was pretext for retaliation. Therefore, the district court did not err in granting summary judgment on Leach's FMLA retaliation claim.

**AFFIRMED.**