[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 17-14298
Non-Argument Calendar

_____

D.C. Docket No. 1:15-cv-01686-RWS

ROSANA JONES,

Plaintiff-Appellant,

versus

AARON'S INC.,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(September 4, 2018)

Before MARCUS, ROSENBAUM and HULL, Circuit Judges.

PER CURIAM:

Plaintiff Rosana Jones appeals the district court's grant of summary judgment to Defendant Aaron's, Inc., Jones's former employer. Jones's complaint alleged that Aaron's (1) terminated her because of her disability and in retaliation for exercising her rights under the Americans with Disabilities Act ("ADA") and (2) interfered with her rights under the Family Medical Leave Act ("FMLA") and retaliated against her for exercising those rights.

After carefully reviewing the briefs and relevant parts of the record, we affirm the judgment in favor of Aaron's as to Jones's ADA discrimination and retaliation claims, but vacate and remand as to her FMLA retaliation and interference claims.

## I.   FACTUAL BACKGROUND

We recount the facts in the light most favorable to Jones.

### A.    Jones's Employment History

On March 19, 2012, Aaron's hired Jones as a Customer Service Representative ("CSR") at its Conyers, Georgia location. As a CSR, Jones's duties were largely devoted to in-store and telephone sales. She was also responsible for new customer growth, direct marketing, and customer payment processing. Jones helped maintain the appearance of the store's display showroom, which typically involved cleaning and organizing Aaron's display showroom. The CSR position required strong interpersonal and organizational skills. CSRs were also required to

2

be able to lift up to 50 pounds.  Jones typically worked 40 hours per week and was paid by the hour, in addition to earning commissions on her sales.

Jones excelled as a salesperson.  She was the top salesperson in her store and was ranked in the top 25 salespersons in her regional division.

## B.    Jones's FMLA Leave and Return to Work

In June 2013, Jones suffered an injury to her back while off work. Subsequently, she was diagnosed with "quadratus lumborum myofascial pain," complaining of pain that radiated from her lower back to her right knee.  This pain restricted Jones's ability to stand for longer than 20 minutes and to lift objects weighing more than 10 pounds.

Jones took FMLA leave from June 2, 2013, until June 17, 2013.  Her request for FMLA leave stated she had "lumbar radiculopathy" and "lumbar sprain."

When Jones returned to work on June 18, 2013, Jones's direct manager, David Piper, scheduled Jones to work roughly 32 hours per week, and not the 40 hours per week Jones had previously worked.[1]

At the end of the two weeks of working at this reduced schedule, Jones complained to her regional manager, Tom Stacks, who restored her schedule to 40 hours per week.  In 2013, Aaron's did not pay Jones for the roughly 16 hours cut

---

[1]More specifically, it appears that Jones actually worked 33.75 hours for the week ending June 22, 2013, and that she worked 29.75 for the week ending June 29, 2013, for a total of 63.5 hours for those two weeks.  That is 16.5 hours less than her prior 40-hour work week or a total of 80 hours.

3

from her schedule.  Aaron's eventually paid Jones for these in June 2016, 15 months after she filed this lawsuit.

After her FMLA leave, Jones continued to experience back pain, received monthly injections in her back, and went to physical therapy.

Jones notified her direct manager Piper of her doctor's medical restrictions. Piper adhered to Jones's medical work restrictions and placed her on light duty, allowing her to perform work while sitting at a computer.

## C.    Jones's New Direct Manager

In October 2013, Chris Cooper became Jones's new direct manager over Jones and the store.  Within a week, Jones began to bristle at Cooper's management style and found him arrogant, dismissive, and picky.  Jones was upset by several of Cooper's management decisions, such as taking away employees' smoke breaks, giving Jones's customers to other CSRs, and changing Jones's work schedule.

Jones's biggest concern with Cooper was he did not honor her medical work restrictions.  According to Jones, Cooper once made her move a desktop computer that was heavier than her restrictions allowed.  Cooper also made demeaning comments to Jones about her physical limitations.  Cooper questioned Jones as to why she could not work, at one point telling Jones that she "really [did] have a lot of issues."  During a meeting with other employees present, Cooper stated that

4

Jones "couldn't do anything." Cooper also disparaged Jones in front of her customers, telling one customer to whom Jones was speaking that Jones "needed a wheelchair" and "was handicapped."

## D.    Jones Complains About Cooper

In October, Jones complained to Cooper. In mid-October 2013, Jones communicated her complaints about Cooper's leadership to Sandy Scott-Dyer, a human resources associate, and to Todd Smith, the regional manager. Most of the complaints related to Cooper's management decisions and style. Jones also complained that Cooper was not adhering to her medical restrictions.

Scott-Dyer and Smith forwarded Jones's concerns about her medical restrictions to Cooper, who was unaware of Jones's restrictions and agreed to begin following them. After Jones complained, Cooper never again forced Jones to lift items that weighed too much or to perform activities that caused her to bend, stretch, or otherwise exacerbate her back. [2] As to her other concerns, Scott-Dyer and Smith explained to Jones that Cooper's management decisions were appropriate, consistent with company policy, and within his discretion. They indicated Cooper ran the store and Jones needed to comply with his requests.

---

[2]We recognize that Jones also claims that Cooper tasked Jones with dusting off the tops of tall shelves (forcing her to stretch and reach too far) and filing documents in cabinets that were low to the ground (forcing her to bend) on three different occasions. But Jones's medical restrictions did not address her ability (or inability) to stretch or bend.

Regardless, once Jones complained to Scott-Dyer and Smith, Cooper adhered to her medical restrictions and did not ask her to perform tasks that involved her stretching or bending.

5

After Cooper began adhering to Jones's restrictions, Jones began to feel like Cooper was being overly restrictive, as he would not allow Jones to perform any non-sales tasks besides answering phones. This bothered Jones, especially when business was slow, because she would get bored. On several occasions, Jones asked Cooper if she could vacuum, dust, or clean the store's windows, but Cooper would not let her.

Notably, Jones also told Smith that Cooper was "a young, cocky, black male with something to prove." Smith felt that Jones's comments were unacceptable and racist. Smith told Jones that she was entitled to her opinion but that she must treat Cooper with respect and cooperate with him as her manager. Smith reported Jones's comments to Scott-Dyer.

### E.    Jones's Complaint on October 25, 2013

On October 25, Jones was scheduled to get off work earlier than usual (at 6:00 p.m. instead of 7:00 p.m.). Jones asked Cooper if she also could have a 30-minute break for lunch. Cooper told Jones that, instead of taking a lunch break, she could go ahead and leave an hour even earlier than scheduled (at 5:00 p.m.).

Cooper's comment upset Jones, who then called Scott-Dyer to complain. Scott-Dyer advised Jones "not to be confrontational" with Cooper and that she and Jones were going to have to meet. Ultimately, that meeting was scheduled for October 30, 2013.

6

**F.      Jones Leaves Work Early on October 28, 2013**

In the meantime, Jones continued to have issues with Cooper.  On October 28, 2013, Jones clocked into work around 10 a.m.  Almost immediately, Jones asked Cooper if she could take a break to take her medicine with a snack. Cooper responded that he did not know and needed to check the company's handbook, which Jones understood to mean no.

Jones admits that: (1) she could have taken the medication before arriving to work; (2) prior to October 28, she always took her medicine before arriving at work and had never requested permission to do so at work; and (3) she took Cooper's response as an insult.  Jones asked Cooper if she should clock out or go home.  Cooper responded "I don't care what you do, it's an at-will state."  Jones left the store just after her 8-hour shift had begun and did not return for the remainder of the day.  Cooper issued a written counseling form to Jones disciplining her for her behavior.

**G.      Meeting on October 30, 2013**

On October 30, 2013, Scott-Dyer and Smith met with Jones and discussed her complaints about Cooper.  During the meeting, Scott-Dyer asked Jones why she left work on the morning of October 28.  Jones responded that she was "tired" of Cooper.  Jones explained her conversation with Cooper.

Scott-Dyer asked Jones if there was any reason why Jones could not have taken her medicine before coming to work or during her lunch break, to which Jones responded there was not. Given that Cooper had recently taken issue with his employees' breaks being too frequent and lasting too long, Scott-Dyer and Smith felt that Jones was purposefully trying to provoke Cooper by requesting the break at the start of her shift.

Scott-Dyer and Smith told Jones that her behavior was unacceptable and that she could not walk out on her shift simply because she disagreed with her manager's response to her break request. Scott-Dyer and Smith encouraged Jones to comply with Cooper's operational and management decisions.

Jones told Scott-Dyer and Smith that she did not respect Cooper as a manager and was not sure if she could cooperate with Cooper's leadership. Smith left the meeting believing that Jones was not going to be able to cooperate with Cooper or behave appropriately. Still, Scott-Dyer and Smith decided that they would wait and see whether Jones could get along with Cooper.

## H. Exchange on October 31, 2013

The next day, on October 31, 2013, Jones called Smith to complain again about Cooper. This time, Jones complained that Cooper refused to help her sell a camera to a customer, stating that the camera was stolen because it had no price tag

8

on it and then leaving the store. Smith told Jones that he would talk to Cooper. Jones then left for lunch.

After returning from lunch, Jones approached Cooper and asked if she could take a day off for a doctor's appointment. Cooper asked for her to bring in a doctor's note. Jones then asked Cooper if they could speak alone. Cooper declined, telling Jones that he would not talk to her unless he had a witness present. Jones responded by saying "Chris, just be a man. Tell me what your problem is with me." Cooper became upset by this comment, yelled at Jones, and walked into his office to call Scott-Dyer and Smith.

Cooper explained to Scott-Dyer and Smith that Jones had yelled at him to "be a man" in front of other store employees. Scott-Dyer advised Cooper to send Jones home for the rest of the day, which he did. Before leaving, Jones asked Cooper if she was fired. Cooper told Jones that he would let her know if she could come in the next day.

After conversing with Cooper, Smith realized that Jones was not going to cooperate with Cooper and that Jones continued to be a disruption in the store. Smith then spoke to Scott-Dyer and recommended terminating Jones for insubordination. Scott-Dyer agreed.

## I.    Jones's Termination on November 1, 2013

By the next morning, Scott-Dyer had drafted a memorandum stating that Jones was being fired for "inappropriate conduct/behavior." Scott-Dyer then called Cooper and directed him to terminate Jones when she came in. Scott-Dyer also emailed Cooper a copy of the termination memorandum.

That same morning, Jones called Cooper and asked if she could come into work, and Cooper responded that she could.[3]

Later that morning, Jones arrived at the store and began her typical CSR duties. At one point, Jones began speaking with a customer whom she asked about buying sports tickets from him. While Jones and the customer were talking, Cooper approached and asked whether their conversation was work related. Jones told Cooper that their conversation was not work related, and the customer told Cooper to mind his own business.

After her conversation with the customer ended, Jones called Scott-Dyer to complain about Cooper's comments concerning the sports tickets. Jones asked Scott-Dyer whether Jones "need[ed] to call the EEOC" in order to change Cooper's behavior. After telling Jones not to worry, Scott-Dyer said she would

---

[3]Before Jones arrived at work, Jones's husband went to the store to speak to Cooper. Jones's husband asked Cooper why he was "messing with [Jones]" and told Cooper that he was negatively affecting Jones's family. Jones's husband also informed Cooper that Jones was thinking about quitting and that Cooper should "not let that happen." Cooper disagreed with Jones's husband's assessment of the situation, but otherwise did not argue with Jones's husband. Jones's husband then left the store.

speak with Smith to get it "squared away." Jones returned to work and finished her shift around 8:00 p.m.

Before Jones left to go home, Cooper approached her and said that he needed to meet with her. Cooper and Jones went into a back office within the store, where Cooper told Jones that she was fired. Jones then left the store.

## J.    Procedural History

On April 22, 2014, Jones filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). On February 12, 2015, the EEOC issued Jones a right-to-sue letter.

On May 12, 2015, Jones filed this lawsuit. Jones's complaint advanced these five claims: (1) an ADA discrimination claim, alleging that Aaron's fired her because of her disability; (2) an ADA retaliation claim, alleging that Aaron's fired her because she complained about Cooper's failure to adhere to her medical restrictions; (3) an FMLA retaliation claim, alleging that Aaron's cut her hours those two weeks in June 2013 because she took FMLA leave; (4) an FMLA interference claim, alleging that Aaron's violated her FMLA rights when it failed to restore her to the same position after she returned from FMLA leave; and (5) a civil rights claim based on Aaron's "reckless indifference" to her federally-protected rights against disability discrimination.

11

On August 10, 2016, Aaron's filed a motion for summary judgment on Jones's claims.[4]  Jones filed several exhibits, including the declarations of two former coworkers—David Piper and Savannah Carter.  On October 24, 2016, Aaron's moved to exclude the declarations of Piper and Carter alleging that Jones failed to provide timely disclosures of the witnesses.

On January 31, 2017, the magistrate judge issued a report ("the report") recommending (1) that Aaron's motion for summary judgment be granted; (2) that Jones's motion for partial summary judgment be denied; and (3) that the declarations of Piper and Carter be excluded.  After a hearing on the report, the district court (1) adopted the report, (2) granted Aaron's motion for summary judgment on all of Jones's claims, (3) denied Jones's motion for partial summary judgment as moot, and (4) excluded the declarations of Piper and Carter.[5]

Jones appealed the district court's granting of summary judgment to Aaron's.[6]

---

[4]That same day, Jones filed a motion for partial summary judgment on Aaron's affirmative defenses, which the district court ultimately denied.  Jones does not appeal that denial so we do not discuss it.

[5]The district court first adopted the report and granted Aaron's motion for summary judgment on September 25, 2017.  Two days later, however, the district court discovered an error in its September 25 order and vacated it.

[6]Jones does not appeal the denial of her motion for partial summary judgment.

## II.  STANDARDS OF REVIEW

This Court reviews <u>de novo</u> a district court's grant of summary judgment. <u>Furcron v. Mail Ctrs. Plus, LLC</u>, 843 F.3d 1295, 1303 (11th Cir. 2016).  Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In determining whether evidence creates a factual dispute, a court should draw reasonable inferences in favor of the nonmoving party, Plaintiff Jones. <u>Furcron</u>, 843 F.3d at 1304.

This Court reviews a district court's evidentiary rulings for an abuse of discretion.  <u>Id.</u>

## III. DISCUSSION

### A.    Exclusion of Piper's and Carter's Declarations

We first conclude that the district court did not abuse its discretion when it excluded Piper's declaration, signed on May 26, 2016, and Carter's declaration, signed on June 13, 2016.  We agree with the district court that Jones failed to timely identify Piper and Carter as witnesses.

Specifically, under Federal Rule of Civil Procedure 26(a)(1)(A)(1), a party must provide to the other party in its initial disclosures the name, address, and telephone number of "each individual likely to have discoverable information" and "the subjects of that information."  Under Federal Rule of Civil Procedure 37(c)(1), "[i]f a party fails to provide information or identify a witness as required

13

by Rule 26(a) . . . the party is not allowed to use that information or witness to supply evidence on a motion . . . unless the failure was substantially justified or is harmless."

Here, Jones's initial disclosures did not list Piper and Carter as witnesses. In fact, Jones did not list Piper and Carter as witnesses until July 11, 2016, which was the last day of discovery. Thus, Aaron's had no opportunity to depose Piper and Carter about the contents of their declarations or conduct any other discovery as to them. Under these circumstances, Jones's failure to identify Piper and Carter in her initial disclosures cannot be said to be harmless. Further, given that the declarations were dated May 26 and June 13 and thus available before July 11, Jones has not shown that her failure was substantially justified or that the district court abused its discretion when it excluded Piper's and Carter's declarations.

We now turn to Jones's claims.

## B.    ADA Discrimination

The ADA provides that covered employers shall not discriminate against qualified individuals with a disability on the basis of that disability. 42 U.S.C. § 12112(a). An employer who fires a qualified employee with a disability violates the ADA if the employer would not have fired the employee but for her disability. McNely v. Ocala Star-Banner Corp., 99 F.3d 1068, 1077 (11th Cir. 1996) ("The ADA imposes a 'but-for' liability standard.").

14

In the absence of direct evidence of discrimination, we apply the burden-shifting framework established by the Supreme Court in <u>McDonnell Douglas</u>[7] to ADA discrimination claims.  <u>See</u> <u>Durley v. APAC, Inc.</u>, 236 F.3d 651, 657 (11th Cir. 2000).  Under this framework, Jones first must establish a prima facie case of ADA discrimination.  <u>Id.</u> at 655-56.  If she does so, the burden of production shifts to Aaron's to assert a legitimate, nondiscriminatory reason for terminating Jones. <u>Id.</u>  If Aaron's produces a legitimate, nondiscriminatory reason, Jones must show that Aaron's proffered reason is false and that the real reason for her termination was her disability.  <u>See</u> <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502, 515, 113 S. Ct. 2742, 2751-52 (1993) (explaining that, under the pretext stage of the burden-shifting framework, a plaintiff must show that the employer's proffered reason for her termination is false and that the real reason for firing her was discrimination).

Here, we assume <u>arguendo</u> that Jones established a prima facie case of ADA discrimination—namely, that (1) she was disabled, (2) she was a "qualified individual" when she was terminated by Aaron's, and (3) she was discriminated against on account of her disability.  <u>Wood v. Green</u>, 323 F.3d 1309, 1312 (11th Cir. 2003).  Aaron's, however, gave a legitimate and nondiscriminatory reason for firing Jones—her disruptive conduct and insubordination as to Cooper.  Thus, the

---

[7]<u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 93 S. Ct. 1817 (1973).

15

burden shifted back to Jones to show that this reason was pretextual and that the real reason for her termination was her disability.

Jones failed to present evidence sufficient to create an issue of fact as to pretext. For starters, Jones does not dispute that she committed several unprofessional and insubordinate actions in the last few weeks of her employment: (1) calling Cooper "a young, cocky, black male" when speaking with Smith; (2) leaving the store in the middle of her shift without being excused, resulting in a short-staffed store; (3) telling Scott-Dyer and Smith that she did not respect Cooper and was not sure if she would be able to comply with his directives; (4) engaging in personal business with a customer during her shift—in violation of Aaron's Code of Conduct (and only one day after she met with Scott-Dyer and Smith to discuss her already-inappropriate behavior); (5) goading Cooper to "be a man"; and (6) repeatedly challenging Cooper's management style and operational decisions in front of other employees and customers.

Second, even if we could ignore Jones's inappropriate conduct, Jones has also failed to show that her disability was the real reason for her termination. If anything, the record evidence demonstrates that Aaron's had no problem with Jones's disability. During the four-month span between Jones's injury (early June 2013) and Cooper's hiring (early October 2013), Aaron's fully adhered to Jones's medical restrictions. We recognize that Cooper tasked Jones with carrying a heavy

16

desktop computer on one occasion, but that was before Cooper learned of her medical restrictions. More importantly, Jones immediately complained to Scott-Dyer and Smith, and Cooper never again violated her medical restrictions. In fact, Jones later complained that Cooper was too obedient in following her medical restrictions, causing her to become bored when Cooper would not let her vacuum or clean windows.

Finally, Cooper's few disparaging remarks about Jones's maladies are insufficient to show pretext. Though these isolated comments can contribute to a circumstantial case for pretext, they are not direct evidence of discrimination and are unrelated to the challenged employment decision. See Rojas v. Florida, 285 F.3d 1339, 1342-43 (11th Cir. 2002).

Simply put, Jones fails to point to evidence in the record that Aaron's fired her because of her disability. The district court did not err in granting summary judgment on Jones's ADA discrimination claim. Mayfield v. Patterson Pump Co., 101 F.3d 1371, 1376-77 (11th Cir. 1996) ("Conclusory allegations of discrimination, without more, are not sufficient to raise an inference of pretext . . . where [an employer] has offered . . . extensive evidence of legitimate, non-discriminatory reasons for its actions." (citations omitted, second and third alteration in original) (quoting Isenberg v. Knight-Ridder Newspaper Sales, Inc., 97 F.3d 436, 443-44 (11th Cir. 1996))).

17

## C.    ADA Retaliation

Jones contends that she established a prima facie case of ADA retaliation—that (1) she engaged in a statutorily protected expression by opposing an unlawful practice (i.e. complaining once about Cooper violating her medical restrictions), (2) she suffered an adverse employment action when she was terminated, and (3) there was a causal link between the two.  Frazier-White v. Gee, 818 F.3d 1249, 1258 (11th Cir. 2016).[8]

As we noted above, Jones has not presented evidence that Cooper violated her medical restrictions more than one time, and that instance occurred before Cooper learned of Jones's restrictions.  In addition, Cooper never denied Jones's request for time off to go to a doctor's appointment; instead, he asked for her to provide a doctor's note before he could approve her time off.  Even assuming arguendo that Jones could show that her complaints about Cooper and her request for time off were causally linked to her termination, which she has not, Aaron's articulated a legitimate reason for terminating Jones—her disruptive and insubordinate behavior.

Likewise, we hold that Jones's ADA retaliation claims fail on pretext.  For the reasons stated above, Jones has not rebutted Aaron's explanation that it fired

---

[8]This Court employs the same McDonnell Douglas burden-shifting framework to ADA retaliation claims.  Stewart v. Happy Herman's Cheshire Bridge, Inc., 117 F.3d 1278, 1287 (11th Cir. 1997).

her for repeated acts of unprofessionalism and insubordination.  Jones also has failed to show that the real reason for her termination was her complaints about Cooper's failure to adhere to her medical restrictions.[9]

## D.    FMLA Claims

Among the substantive rights given to eligible employees under the FMLA are the right to 12 weeks of "leave during any 12-month period . . . [b]ecause of a serious health condition that makes the employee unable to perform the functions of the position," 29 U.S.C. § 2612(a)(1)(D), and the right following leave "to be restored by the employer to the position of employment held by the employee when the leave commenced" or "to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment."  Id. § 2614(a)(1)(A)-(B); see Batson v. Salvation Army, ___ F.3d ___, No. 16-11788, 2018 WL 3628184, at *7 (11th Cir. July 31, 2018).  To enforce these rights, the FMLA creates two types of claims: interference claims, which assert an interference with a substantive right under the Act, see 29 U.S.C. § 2615(a)(1), and retaliation claims, which assert that the employer discriminated because of the employee's engaging in activity protected by the Act, see 29 U.S.C. § 2615(a)(1)

---

[9]Because we affirm the district court's grant of summary judgment on Jones's ADA claims, we also affirm the district court's grant of summary judgment on Jones's civil rights claim, which was premised on Aaron's alleged violations of her ADA rights.

& (2). Strickland v. Water Works & Sewer Bd., 239 F.3d 1199, 1206 (11th Cir.

2001).

Often, as alleged here by Jones, the same employment actions can form the

basis for FMLA claims of interference and retaliation. See, e.g., Batson, 2018 WL

3628184, at *3-4, 8-9 (involving interference and retaliation claims arising out of

the elimination of an employee's current position and refusal to rehire her to an

open position she had previously held after she returned from FMLA leave);

Schaaf v. Smithkline Beecham Corp., 602 F.3d 1236, 1239-40 (11th Cir. 2010)

(involving interference and retaliation claims arising out of an employee's

demotion upon her return from FMLA leave); Strickland, 239 F.3d at 1202-03,

1206 (involving interference and retaliation claims arising out of an employee's

termination after taking FMLA leave).

### 1.    FMLA Retaliation

The district court found that Jones's FMLA retaliation claim failed at the

pretext stage. Specifically, the district court found that Jones failed to show that

Aaron's proffered reason for terminating her was false and that the real reason was

her FMLA leave.

To the extent that Jones's FMLA retaliation claim centered on the allegation

that Aaron's fired her for exercising her FMLA rights, the district court was

correct—Jones failed to show that Aaron's legitimate explanation for her termination was a pretext for FMLA retaliation, for the same reasons stated above.

The problem is that the district court misconstrued Jones's FMLA retaliation claim as being premised on only her termination when it was based instead on her reduction in hours after her return from FMLA leave.

"To prove FMLA retaliation, an employee must show that h[er] employer intentionally discriminated against h[er] for exercising an FMLA right." Martin v. Brevard Cty. Pub. Sch., 543 F.3d 1261, 1267 (11th Cir. 2008). Absent direct evidence of retaliatory intent, we apply the same McDonnell-Douglas burden-shifting framework used to evaluate Jones's ADA discrimination and retaliation claims. See Martin, 543 F.3d at 1268.

To establish a prima facie case of FMLA retaliation as to the two weeks of reduced hours, Jones had to show that (1) she engaged in a statutorily protected activity, (2) she suffered an adverse employment action, and (3) the adverse action was causally related to the protected activity. Schaaf, 602 F.3d at 1243. Jones's FMLA retaliation claim based on her reduction in hours met this burden.

Jones engaged in a statutorily protected activity when she took FMLA leave for two weeks in early June 2013. When she returned, Jones's schedule was reduced to only 32 hours per week, instead of her prior 40 hours per week. In other words, she went from full-time to part-time work. Because she was an

21

hourly employee, this change to part-time work meant that Jones earned less money for those two weeks. Jones also lost the opportunity during those cut hours to make sales from which she could have earned a commission. Thus, reducing Jones's hours to part-time work was a materially adverse employment action. Cf. Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 67-68, 126 S. Ct. 2405, 2415 (2006) (concluding in the Title VII retaliation context that an employment action is "materially adverse" when it involves a significant harm and might dissuade a reasonable worker from engaging in the protected activity, but material adversity does not include trivial harms, petty slights, or minor annoyances); Bass v. Bd. Of Cty. Comm'rs, 256 F.3d 1095, 1118 (11th Cir. 2001) ("[A]ctions which deprived [the plaintiff] of compensation which [s]he otherwise would have earned clearly constitute adverse employment actions for purposes of Title VII.").

Given the close temporal proximity between her FMLA leave (June 3-17) and her reduction in hours right when she returned (June 18-29), Jones also satisfied the causal connection element for purposes of a prima facie case. See Hurlbert v. St. Mary's Health Care Sys., 439 F.3d 1286, 1298 (11th Cir. 2006) (explaining that, at the prima facie stage, "[c]lose temporal proximity between protected conduct and an adverse employment action is generally sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection" (quotation marks omitted)).

22

Because Jones established a prima facie case of FMLA retaliation, the burden shifted to Aaron's to proffer a legitimate, nondiscriminatory reason as to why it reduced Jones's hours after she returned from FMLA leave. To meet its burden, Aaron's claimed that Jones asked her manager to reduce her hours when she returned from FMLA leave. In support, Aaron's cited to internal emails between Aaron's human resources personnel in September 2013 indicating that Jones asked to work fewer hours when she returned from FMLA leave because of her ailing back. Notably, none of these emails were authored by Jones.

While one email (authored by Christy Wilson and sent to Sandy Scott-Dyer and Jill Reinert) states that Jones requested a reduced-hours schedule to 32 hours, the same email states that her request was <u>denied</u> due to a policy that all full-time employees must work 40 hours per week. Further, handwritten notes on a printout of the email indicate that, "Per Jill," Jones did not request part-time work and that it was Jones's former supervisor, David Pier, who put her on a part-time schedule. Consistent with this note, Sandy Scott-Dyer averred in her declaration that after receiving Christy Wilson's email, Jill Reinert "spoke with Ms. Jones and received a detailed account of the issues," Jones was having with Piper and then told Scott-Dyer that "when Ms. Jones returned from FMLA leave in June 2013, she did not immediately get scheduled for forty (40) hours a week." In any event, in her

23

deposition, Jones testified that Aaron's cut her hours, which contradicts Aaron's claim that she requested reduced hours.

In short, in the record as it stands now, there is a factual dispute as to whether Aaron's proffered non-retaliatory reason for reducing Jones's hours—because she requested it—is true. To establish pretext, however, a plaintiff must show not only that the proffered reason is false, but also that the real reason was the plaintiff's FMLA leave. See Schaaf, 602 F.3d at 1244 & n.3 (explaining that to show the employer's reason was pretext for FMLA retaliation it is not enough to cast doubt on the employer's reason and that the plaintiff must also present evidence from which a jury could find that the employer was motivated by a retaliatory animus). In this summary judgment posture, we accept the facts in the light most favorable to Jones—that Aaron's cut her hours—but we point out that Jones still must show that Aaron's cut her hours in retaliation for her taking FMLA leave. Because a factual issue exists, we vacate the grant of summary judgment on Jones's FMLA retaliation claim and remand for further consideration of the pretext issue by the district court in the first instance.

### 2.    **FMLA Interference**

Similarly, the district court erred in granting summary judgment on Jones's FMLA interference claim.

24

"[T]o state a claim that [her] employer has interfered with a substantive FMLA right, a plaintiff need only demonstrate that [she] was entitled to but denied the right." Strickland, 239 F.3d at 1208. However, the plaintiff does not have to allege that her employer intended to deny the right, as the employer's motives are irrelevant. Id.

As already mentioned, an employee has a right following FMLA leave to be restored to the same position or to an equivalent position "with equivalent employment benefits, pay, and other terms and conditions of employment." 29 U.S.C. § 2614(a)(1)(B). Regulations require an "equivalent position" to be "virtually identical to the employee's former position in terms of pay, benefits, and working conditions." 29 C.F.R. § 825.215(a). Further, "equivalent pay" includes "the same or equivalent pay premiums," such as average overtime pay and bonuses, and "equivalent terms and conditions of employment" includes "the same shift or the same or an equivalent work schedule." Id. § 825.215(c), (e). This right "does not extend to de minimis, intangible, or unmeasurable aspects of the job." Id. § 825.215(f).

The right to be restored to the same or an equivalent position "is not absolute." Martin, 543 F.3d at 1267. If the employer interfered with the plaintiff's FMLA rights, the employer can escape liability by showing that it would have interfered with the plaintiff's FMLA rights for reasons unrelated to any FMLA

25

leave.  Parris v. Miami Herald Publ'g Co., 216 F.3d 1298, 1301 n.1 (11th Cir. 2000) (explaining that an employer that interferes with an employee's FMLA right "bears the burden of proving that the employee would have [had her FMLA rights violated] . . . for reasons unrelated to the [FMLA right]"); see 29 U.S.C. § 2614(3)(B) ( "Nothing in this section shall be construed to entitle any restored employee to . . . any right, benefit, or position of employment other than any right benefit, or position to which the employee would have been entitled had the employee not taken the leave.").  Put another way, if an employer can show that it refused to reinstate the employee to her former position for a reason wholly unrelated to the FMLA leave, there is no liability.  Strickland, 239 F.3d at 1208 (describing the limitation in § 2614(a)(3) as an "affirmative defense").

An employer asserting this affirmative defense is entitled to summary judgment if the record establishes "beyond dispute" that the employer would not have restored the employee to the same or an equivalent position even if she had not taken FMLA leave.  Martin, 543 F.3d at 1267; Strickland, 239 F.3d at 1208; see also Batson, 2018 WL 3628184, at *9 ("[W]e ask whether the evidence, viewed in the light most favorable to the non-moving party, establishes as a matter of law that the employer would have terminated the employee regardless of her request for or use of FMLA leave.").  In evaluating this question, "courts examine not whether the FMLA leave was the but-for cause of an employee's discharge or

26

demotion, but rather whether it was the proximate cause." See Schaaf, 602 F.3d at 1242 (explaining that, for an employer to be held liable for FMLA interference, the plaintiff's exercise of her FMLA rights must have been the proximate cause of the interference).

Here, Jones presented evidence that she was not restored to a position with the same full-time pay that she had before she took her FMLA leave. Thus, Jones has shown that Aaron's interfered with her FMLA rights.

Aaron's advances two arguments concerning Jones's FMLA interference claim. First, Aaron's argues that it did not interfere with Jones's FMLA rights when it reduced her hours from 40 to 32 hours per week following her June 2013 FMLA leave, because Jones was never entitled to work 40 hours in the first place. Second, Aaron's argues that any FMLA interference was harmless because Aaron's eventually paid Jones (in June 2016) for the hours that she would have worked in June 2013 had her hours not been reduced.**]**

The district court agreed with Aaron's first argument, finding that no FMLA interference occurred because Jones was never entitled to a 40-hour work week. The district court granted summary judgment on that basis alone, never analyzing whether Aaron's reason for cutting Jones's hours was wholly unrelated to her FMLA leave.

The district court erred in its analysis. Jones was entitled under the FMLA to return to the same job (or an equivalent position offering the same pay and benefits) that she had before she took FMLA leave. 29 U.S.C. § 2614 (a)(1). It is undisputed that as a CSR, Jones worked a full-time, 40 hours per week and that when Jones finished her FMLA leave, she returned to a part-time CSR position with her hours reduced to 32 hours per week. Thus, when Aaron's failed to restore Jones to a 40-hour work week, it cut her pay and interfered with her FMLA rights. Whether Aaron's had a reason for this interference that was wholly unrelated to Jones's FMLA leave is a question we leave for the district court to answer.

Aaron's second argument—that its eventual payment to Jones for the reduced hours absolved it of FMLA liability—also fails. Employers cannot escape liability for illegal adverse employment decisions by making retroactive payments to aggrieved employees. Crawford v. Carroll, 529 F.3d 961, 971-72 (11th Cir. 2008). "To conclude otherwise would permit employers to escape [employment discrimination] liability by correcting their discriminatory and retaliatory acts after the fact." Id. at 972 (explaining that the employer's retroactive pay increase to the plaintiff-employee did not preclude a finding of adverse employment action). Moreover, Aaron's late payment to Jones does not alter the fact that Jones was denied payment because of an alleged FMLA violation, nor does it erase the injury

28

caused by this alleged FMLA violation—specifically the lost value and use of the funds in the three years before she received payment.  See id.

We therefore vacate the district court's grant of summary judgment on Jones's FMLA interference claim and remand it back to the district court.  On remand, the district court must decide whether the record establishes beyond dispute that this interference was "wholly unrelated" to Jones's FMLA leave.[10]

## IV.  CONCLUSION

For the foregoing reasons, we affirm the district court's order granting summary judgment to Defendant Aaron's, except as to Jones's FMLA retaliation and interference claims.  As to these claims, we vacate the district court's order and remand the case for further proceedings consistent with this opinion.

**AFFIRMED IN PART; VACATED AND REMANDED IN PART.**

---

[10]Plaintiff Jones also argues that the district court violated her Seventh Amendment right to a jury trial when it granted summary judgment to Aaron's on all of her claims.  This argument is meritless.  Summary judgment does not violate the Seventh Amendment.  Parklane Hosiery Co. v. Shore, 439 U.S. 322, 336, 99 S. Ct. 645, 654 (1979) (citing Fidelity & Deposit Co. v. United States, 187 U.S. 315, 319-321, 23 S. Ct. 120, 121–122 (1902)); Zivojinovich v. Barner, 525 F.3d 1059, 1066 (11th Cir. 2008) (describing as "meritless" the argument that summary judgment unconstitutionally deprives plaintiffs of their Seventh Amendment rights to a jury trial).