[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

————————————————

No. 21-13430

Non-Argument Calendar

————————————————

FRANK L. GARGETT, JR.,

Plaintiff-Appellant,

*versus*

FLORIDA DEPARTMENT OF JUVENILE JUSTICE,

Defendant-Appellee.

————————————————

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 8:19-cv-02051-VMC-TGW

————————————————

Before WILSON, ANDERSON, and JULIE CARNES, Circuit Judges.

PER CURIAM:

Plaintiff Frank L. Gargett, Jr. appeals the district court's grant of summary judgment in favor of his former employer, the Florida Department of Juvenile Justice ("DJJ"), on his claims under the Age Discrimination in Employment Act ("ADEA"), the Florida Civil Rights Act of 1992 ("FCRA"), and the Family and Medical Leave Act ("FMLA"). Plaintiff's Complaint alleged that the DJJ temporarily transferred him to a different position in retaliation for his exercise of protected conduct, violated his FMLA rights, and ultimately fired him because of his age, in violation of the ADEA. After careful review, we affirm the district court's grant of summary judgment as to Plaintiff's retaliation and FMLA claims, but reverse as to the grant of summary judgment on Plaintiff's ADEA claim and his corresponding Florida FCRA claim.

## I.    BACKGROUND

### A.    Factual Background[1]

At the age of 57 and after working for the DJJ for 19 years, Plaintiff was fired by his employer. Plaintiff had begun his employment with the DJJ in November of 1998 and, working his way up the ladder, he had been promoted to Director of Detention

---

[1] We set out the facts and evidence in this section in the light most favorable to the non-moving party, the Plaintiff. *See Chambless v. Louisiana-Pacific Corp.*, 481 F.3d 1345, 1349 (11th Cir. 2007).

Services for Central Florida, in August of 2014.  This was a high-ranking position, as there were only three directors of detention services in the entire state.  In that position, Plaintiff oversaw six juvenile detention facilities, their six supervisors, and all the staff employed at those facilities.  He directly reported to the Assistant Secretary for DJJ.  Ten months after Plaintiff had been named the Director of Detention Services in the Central Florida district, Dixie Fosler was named DJJ's new Assistant Secretary and, accordingly, she became Plaintiff's boss.

Within six months after Fosler became his supervisor, Plaintiff had become very concerned that she intended to get him fired.  In January of 2016, a subordinate at one of his detention centers told Plaintiff that she had heard Plaintiff was "not going to be [t]here much longer."  This was consistent with other things he had been hearing for several months.  He had also heard that Fosler was talking about him behind his back to staff members who had no business being made aware of the particular matters being discussed.

Accordingly, on January 25, 2016, Plaintiff sent Fosler a lengthy email titled "Rumors/Concern's."  He began by noting that in the last quarter of 2015 "there were several rumors going around the region and elsewhere that I would not be around long and that I would [be] removed from my position."  Plaintiff indicated that, at the time, he didn't feel the need to address these rumors, as he had always given 100% and was aware of no major issue with his performance.  Nevertheless, on January 21, a

subordinate at a detention center to whom he had never before spoken repeated this same rumor to him. Then on that same day, Plaintiff overheard a conversation between headquarters staff[2] in which the latter said that Plaintiff could not be trusted and to be careful what was said to him. Plaintiff explained, "To think that these rumors are floating around are very alarming and concerning." Accordingly, Plaintiff stated, he felt that his "honesty, integrity, commitment and dedication to the department" was in question.

Given these events, Plaintiff requested in the email that Fosler identify in writing any performance-based issues she had with Plaintiff, so Plaintiff could address them. If there were no issues with his performance, Plaintiff inquired whether Fosler's attitude toward him was based on his gender, age, or just a dislike of him. He noted in the email that Fosler had previously characterized Plaintiff as "old school" and a "dinosaur."

As to the concerns section of the email, Plaintiff pointed to specific incidents in which two of his subordinates whom he perceived to be protégées[3] of Fosler—Kevin Housel and Colette

_____

[2] Fosler and her immediate subordinates were considered headquarters staff. Those persons whom Plaintiff supervised in the Central District were considered regional staff.

[3] The email indicated that Fosler had urged Plaintiff to have "faith and trust in Kevin and Colette," but Plaintiff asked how that was possible when they were keeping things from him and providing him with only selective information.

Antozzi—were intentionally keeping him in the dark about important matters on which he had to be informed in order to perform his duties. Indeed, one of Plaintiff's subordinates, a Mr. Seeber, reported to Plaintiff that he had expressed concern to Antozzi that Plaintiff was not informed about a disturbance at one of the detention centers that Antozzi oversaw, to which Antozzi responded, "There are somethings we do not tell Gargett." Indeed, "several staff in the regional office indicate that I (plaintiff) need to watch my back as there is an appearance of deception and people undermining my authority."

In closing, Plaintiff requested an in-person meeting with Fosler. Plaintiff then met face-to-face with Fosler to further address any concerns she may have had, although the record provides little information about the substance of that conversation. Fosler did not respond in writing to Plaintiff's request that she identify any areas in which he should improve his performance.

As to Plaintiff's question in the e-mail whether Fosler's hostility to him was based on his age, Plaintiff testified that on multiple occasions Fosler had expressed to him a strong bias against older employees. Plaintiff and Fosler had been peers prior to both of their promotions and during that time Fosler had indicated that her philosophy as to employees was out with old, and in with the new. In one conversation with Plaintiff, Fosler indicated that 20% of his existing supervisors would likely be gone within a year.[4] As he and

---

[4] According to Plaintiff, this prediction turned out to be accurate, as five of the six detention center supervisors in his district ultimately left, either

6                    Opinion of the Court                    21-13430

Fosler had always gotten along well, he had not anticipated that, upon her promotion, he would be one of those "old" employees that she sought to terminate.

Not only did Plaintiff hear Fosler make ageist statements on numerous occasions, but so did another staff member who directly reported to Fosler. Maureen Honan testified in her deposition that Fosler bullied employees and made demeaning and vulgar comments about employees, referring to some of them as "pieces of shit and garbage and idiots and dumb-asses." As to age-related comments, Honan heard Fosler on more than one occasion indicate that she wanted a younger workforce. When a vacancy arose, Fosler would say that she didn't want an old fogie or old fart, but wanted someone young. According to Honan, Fosler's expressed motto was "out with the old, in with the new."

Shortly after the January 2016 email from Plaintiff and the subsequent meeting with Fosler, Fosler temporarily reassigned Plaintiff from Tampa to Miami to fill in for approximately eight weeks for the Southern District Supervisor of Detention Services

---

because they were fired or, according to Plaintiff, were harassed so badly that they left. Plaintiff has likewise noted that all three of the incumbent regional directors left their position during Fosler's tenure: Negron resigned, Wenhold agreed to move to a demoted position because of constant harassment by Fosler, and thereafter Plaintiff was fired. That said, Plaintiff has not litigated this case under a theory that Fosler systemically fired or pushed out older employees, nor has he provided an adequate evidentiary basis for such a claim, and we therefore do not consider in our analysis of this summary judgment motion the fact that several older supervisory officials were allegedly pushed out of their jobs by Fosler.

who had resigned.  Although Plaintiff told Fosler that he would rather not go to Miami, he accepted the assignment and ultimately received an award for the leadership and teamwork he demonstrated there.

Turning to Plaintiff's ultimate termination, Fosler initiated a request in mid-April 2017 to fire Plaintiff and began the process necessary to do so.  According to the May 2, 2017 memorandum prepared by the agency's assistant general counsel, Fosler had recommended Plaintiff's termination and counsel alleged that this was justified based on:  his poor performance, negligence, inefficiency or inability to perform assigned duties, insubordination, violation of law or agency rules, and conduct unbecoming a public employee.  Notably, and as discussed *infra*, other than this memorandum drafted by counsel, Defendant introduced no testimony indicating that Plaintiff was fired for the above reasons.  Specifically, when asked why she had sought Plaintiff's termination, Fosler answered that she did not recall.[5]  Nor did Defendant submit an affidavit from Fosler fleshing out the allegations set out in counsel's memo.

Given what we assume to have been Fosler's alleged representations, the assistant general counsel concluded in the memorandum that Fosler had asserted sufficient grounds to terminate Plaintiff.  This memorandum was then submitted to Timothy

---

[5] Indeed, according to our count, Fosler answered 71 times that she "did not recall" in response to questions posed by Plaintiff's counsel during her deposition.

Nierman, the agency's Deputy Secretary, who accepted the recommendation and on May 3 authorized Fosler to fire Plaintiff.

On the same morning of May 3, Plaintiff had emailed Nierman outlining several issues he had with Fosler, including "constant harassment and bullying." Plaintiff noted that Fosler had made it clear to her staff that she wanted him gone, questioned whether this was based on his age, and requested a meeting with Nierman. That same day, Fosler went to the regional office in Tampa to inform Plaintiff of his termination, but Plaintiff had already left the office for the day because his son was injured at school. Plaintiff attempted to reschedule the meeting with Fosler for the following day, but Plaintiff testified that Fosler instead opted to terminate him via text on May 3 and then immediately announced the termination to the regional office staff, without first having spoken to Plaintiff. That afternoon, detention services staff received an email advising that Plaintiff was "no longer working for the department." On May 4, Plaintiff sent another email to "everybody within the chain of command" at the DJJ, further outlining his concerns about his mistreatment and the mishandled termination process.

Despite the DJJ's prior communications to Plaintiff and staff indicating that Plaintiff had been dismissed, Nierman put Plaintiff's termination on hold to give Plaintiff "every avenue of . . . consideration . . . ." Nierman thus sought to address the grievances Plaintiff raised in his recent emails. Additionally, the DJJ learned that Plaintiff had recently requested FMLA leave for biceps surgery, and

vetting this request also played a role in staying Plaintiff's termination.

Nierman told Plaintiff that he would remain in his position until everything was "cleared up." The DJJ ultimately granted leave for the FMLA request, retroactive to May 5. Plaintiff testified that Nierman initially offered to allow Plaintiff to remain employed until the end of May to get his biceps surgery, but based on later conversations with Nierman, Plaintiff believed he would keep his job indefinitely. On July 7, Plaintiff's doctor cleared him for light duty, but the DJJ would not allow him to return because he had a five-pound lifting restriction.

Regardless of Plaintiff's hope, the DJJ had already decided that Plaintiff would not return to his previous detention services role. Instead, Nierman attempted to find another position for Plaintiff. On July 31, the DJJ emailed Plaintiff a settlement agreement that, in return for Plaintiff agreeing to drop any legal claims arising from his removal as the director of detention, DJJ would reassign him to a consultant role with less pay, loss of certain benefits, and relocation from Tampa to Lakeland. In addition, Plaintiff would be on probationary status.

On August 9, Plaintiff submitted a second FMLA leave request to address a knee injury. On August 11, the DJJ again sent Plaintiff the offer letter for the consultant role, indicating that August 14 was the final day for Plaintiff to decide whether he would accept the position. After Plaintiff let the due-date pass without communicating a decision, the DJJ sent him an official dismissal

letter on August 18. That same day, the DJJ notified Plaintiff that it was denying his second FMLA leave request due to "separation." Plaintiff was fifty-seven years old when he received his official dismissal letter.

### B.    Procedural History

Plaintiff subsequently filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") against the DJJ, and the EEOC thereafter issued a "right to sue" letter to Plaintiff.

Thereafter, Plaintiff filed a Complaint against the DJJ alleging age discrimination and retaliation in violation of the ADEA and the FCRA. Plaintiff also alleged two counts of FMLA violations, including FMLA interference. Following discovery, the DJJ moved for summary judgment. The district court referred the matter to a magistrate judge for a Report and Recommendation ("R&R"), and the latter recommended granting the DJJ's motion for summary judgment. The district court accepted and adopted the R&R, granted the DJJ's motion for summary judgment on all counts, and entered a final judgment for the DJJ. This appeal followed.

## II.    STANDARD OF REVIEW

We review a district court's grant of summary judgment *de novo*, viewing all evidence in the light most favorable to the non-moving party. *Owen v. I.C. Sys., Inc.*, 629 F.3d 1263, 1270 (11th Cir. 2011). A movant is entitled to summary judgment if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A dispute

about a material fact is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## III.    DISCUSSION

On appeal, Plaintiff argues that the magistrate judge and district court erred by granting summary judgment to the DJJ on: (1) Plaintiff's age discrimination claims; (2) Plaintiff's retaliation claims; and (3) Plaintiff's FMLA interference claim. We address each issue in turn.

### A.    Magistrate Judge's Refusal to Consider, On the Merits, Plaintiff's Opposition to Summary Judgment on the Age Discrimination Claim

#### 1.    Background

As discussed *infra*, we conclude that Plaintiff's opposition to Defendant's motion for summary judgment on his age discrimination claim was meritorious. That is, on the merits, Defendant's motion for summary judgment on this claim should have been denied. The magistrate judge, however, concluded that Plaintiff had essentially waived any opposition because his response to the motion for summary judgment did not thoroughly flesh out his argument. We disagree with the magistrate judge's decision and explain why.

A few days after Defendant filed its initial motion for summary judgment, Defendant filed a motion to correct that motion because the latter had incorrectly recited the numbers of exhibits

relied on in the pleading. The district court granted that motion, but it also noted that Defendant had failed to comply with the court's requirements that a motion for summary judgment contain a statement of material facts. Defendant's motion contained no such statement, but instead merely included "a series of unnumbered paragraphs with multiple facts often lumped into a single paragraph." Accordingly, the district court required Defendant to refile a motion for summary judgment that complied with the standards applied to motions for summary judgment.

Defendant then filed what became its third summary judgment motion. That motion included a numbered statement of material facts, as directed by the district court, and a very brief argument—slightly over a page—setting out the basis for its contention that Plaintiff was not fired because of his age.

Plaintiff's response to Defendant's motion included a detailed response to Defendant's statement of material facts, setting out with particularity his reasons for disagreeing with many of those facts. Plaintiff also set out, with citations to the record, very detailed "additional material facts" that explained Plaintiff's basis for contending that he had been fired because of his age. Like Defendant's motion, the argument section of Plaintiff's response was brief, containing just over a page. Plaintiff argued that Defendant's stated reasons for firing him were a pretext for its real reason, which Plaintiff said was his age, and he incorporated his eight-page statement of additional material facts as support for this argument.

Defendant filed a reply in which it characterized Plaintiff's statement of material facts as self-serving, uncorroborated, and conclusory and stated that Plaintiff had failed to show that age was the reason for his termination.

The magistrate judge issued an R&R in which he granted Defendant's motion for summary judgment as to all claims. As to the age claim, the R&R stated that Plaintiff had not "specif[ied]" why Defendant's reasons were pretextual. It further said that Plaintiff's reliance on his own statement of material facts was an "undeveloped assertion" that was insufficient to negate Defendant's articulated non-age-based reasons for firing Plaintiff. The R&R did not mention the statements of age bias attributed to Fosler by Plaintiff and his witness. The district court issued a brief order adopting the R&R, indicating that Plaintiff had failed to show that the reasons asserted in Defendant's summary judgment motion as the basis for Defendant's firing of Plaintiff were a pretext for age discrimination.

### 2.    Discussion

As set out below, we conclude that, on the merits, Plaintiff has adequately created an issue of fact as to the question whether Defendant's stated reasons for firing him were a pretext for the real reason: his age. The question is whether we must refrain from consideration of the merits of the claim given the magistrate judge's determination that Plaintiff had offered only an "undeveloped assertion" as to this matter. In effect, the magistrate judge determined that Plaintiff had abandoned any opposition to

Defendant's motion for summary judgment on the age discrimination claim.  And the district court did not reject the magistrate judge's decision not to consider the merits of Plaintiff's argument that the record provided evidence from which a jury could infer that Defendant's stated reasons for firing Plaintiff were a pretext for age discrimination.

For sure, there is case authority finding no abuse of discretion in a district court's refusal to consider an argument in a litigant's objection to a magistrate judge's R&R when that argument was never raised before the magistrate judge.  *See, e.g., Club Madonna Inc. v. City of Miami Beach*, 42 F.4th 1231, 1259–60 (11th Cir. 2022) (district court did not abuse its discretion when it declined to entertain a preemption argument that had never been made before the magistrate judge in over three years of litigation); *Lodge v. Kondaur Cap. Corp.*, 750 F.3d 1263, 1274 (11th Cir. 2014) (in ruling on an objection to an R&R, the district court did not abuse its discretion when it declined to consider new documentary evidence because that evidence was never mentioned before the magistrate judge and because the evidence was inadmissible).  Likewise, in *Williams v. McNeil*, 557 F.3d 1287 (11th Cir. 2009), our Court found no abuse of discretion when, in considering a party's objection to the R&R, the district court refused to consider the party's argument that his petition was timely, as the party had earlier declined to defend the petition's timeliness, even when directed by the magistrate judge to file a reply on that very issue.  *Id.* at 1292.

In each of the above cases, the party had flat-out failed to make the particular argument before the magistrate judge that he was attempting to raise for the first time before the district court. Here, in contrast, Plaintiff expressed the substance of the argument that Defendant's non-age-related reasons for firing him were pretextual, but that argument was not fleshed out in the discussion section of his response, instead being set out in the additional statement of facts that Plaintiff offered and adopted as part of his argument. So, Plaintiff clearly did not intend to abandon this potentially summary judgment-determinative argument.

That said, we are sympathetic to the magistrate judge's frustration. Of course, Plaintiff's counsel should have spelled out more fully in the substantive section of his response the specific reasons why he contended that Defendant's reasons were pretextual. Asking the magistrate judge to go back through the Plaintiff's additional statement of facts to figure out why Plaintiff's argument of pretext held water constituted deficient performance by counsel that essentially asked the judge to unnecessarily expend his own time and effort to fill in the blanks as to Plaintiff's argument.

Yet, to the extent that Plaintiff's argument was not fleshed out sufficiently, the magistrate judge could have directed Plaintiff to refile a response that accomplished that goal. Indeed, when Defendant's counsel in his initial summary judgment motion had failed to file a statement of material facts—which is a key component of a motion for summary judgment—the magistrate judge did not outright deny the motion based on this critical omission, but

instead gave Defendant an opportunity to correct that omission in a new filing.  Plaintiff could have been given the same opportunity.  Moreover, a side-by-side comparison of Defendant's motion compared with Plaintiff's response indicates that Defendant's argument was similarly spare.  Specifically, Defendant's summary judgment motion contained nine pages of detailed material facts.  As to Defendant's argument in favor of summary judgment on the age discrimination claim, Defendant's "fleshing out" of its argument was almost as bare-boned as Plaintiff's, in that it was only one page in length, and it too consisted largely of references back to record citations without repeating, with any specificity, the information found in the statement of material facts.

In short, given the particular circumstances here, we conclude that the magistrate judge and district court abused their discretion by failing to consider on the merits Plaintiff's argument that Fosler's statements of age bias, combined with facts contradicting Defendant's professed reasons for firing him, served to create an issue of fact concerning pretext.  That being so, we now consider on the merits those contentions by Plaintiff.

### B.      ADEA and FCRA Age Discrimination Claims[6]

---

[6]  Age discrimination actions under the FCRA are analyzed under the same framework that applies to the ADEA. *Mazzeo v. Color Resols. Int'l, LLC*, 746 F.3d 1264, 1266 (11th Cir. 2014); *see also Zaben v. Air Prods. & Chems., Inc.*, 129 F.3d 1453, 1455 n.2 (11th Cir. 1997) ("Age discrimination claims brought under the Florida Civil Rights Act have been considered within the same framework used to decide actions brought pursuant to the ADEA.").

1.     Analytic Framework for Evaluating Summary
       Judgment Motion

The ADEA prohibits an employer from taking an adverse employment action against an employee who is forty years or older because of that employee's age. *Mazzeo*, 746 F.3d at 1270; *see also* 29 U.S.C. § 623(a)(1). To succeed on such a claim, the plaintiff-employee must establish that his age was the "but-for" cause of the adverse action. *Liebman v. Metro. Life Ins. Co.*, 808 F.3d 1294, 1298 (11th Cir. 2015) (citing *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009)).

An ADEA plaintiff may establish the validity of his claim through either direct or circumstantial evidence, although a different standard for evaluating a defendant's motion for summary judgment applies depending on which type of evidence the plaintiff cites in support of his claim. *Akouri v. State of Fla. Dep't of Transp.*, 408 F.3d 1338 (11th Cir. 2005). When a plaintiff has presented direct evidence of discrimination based on the particular prohibited ground at issue that, if believed, would be sufficient to win at trial, then summary judgment is inappropriate. *Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1189 (11th Cir. 1997). When, as is the more typical case, a plaintiff offers only circumstantial evidence of such discrimination, we evaluate the defendant's summary judgment motion under the familiar burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973). *See Mazzeo*, 746 F.3d at 1270; *Sims v. MVM, Inc.*, 704 F.3d 1327, 1332 (11th Cir. 2013).

Here, Plaintiff has not argued that Fosler's alleged age-related comments[7] constitute direct evidence of age discrimination. That is understandable as we likewise conclude that the alleged statements do not meet the standard for demonstrating direct evidence. Specifically, Plaintiff has introduced evidence of statements by Fosler from which one might infer that, as a general matter, she was biased against older employees.[8] To constitute direct evidence of illegal discrimination as to the particular individual who has sued, however, the evidence must, "if believed, prove[] the existence of [that] fact *without inference or presumption.*" *Ossmann v. Meredith Corp.*, 82 F.4th 1007, 1015 (11th Cir. 2023) (quotations omitted). This is a "rigorous standard," under which we characterize as direct evidence "only the most blatant remarks, such as a management memorandum saying, 'Fire Earley—he is too old.'" *Id.* (quotation marks omitted). Nevertheless, if the alleged statement merely suggests, but does not prove, a discriminatory motive, it may nonetheless be considered to be circumstantial evidence of discrimination when determining a defendant-employer's motion for summary judgment. *Id.*

---

[7] Fosler denies that she made the statements in question, but in evaluating a summary judgment motion, we must take the facts in the light most favorable to the non-movant plaintiff.

[8] To repeat, Fosler allegedly indicated that her philosophy was "out with the old and in with the new," that younger employees were more tech-savvy and would bring a fresh attitude to their work, and that when vacancies arose she would prefer younger employees as opposed to "old farts."

Here, Fosler's statements do not meet the rigorous standard required for direct evidence of a discriminatory motive, but they do constitute a piece of evidence that could possibly support an inference that Fosler acted to terminate Plaintiff based on such motives. In other words, if a jury believed that Fosler made the statements, the latter could be considered, along with other evidence, in determining whether Plaintiff's dismissal occurred because of Fosler's bias against older employees. And, as noted, to determine whether summary judgment is nonetheless warranted for the defendant when a plaintiff presents circumstantial evidence to establish an ADEA claim, as Plaintiff does here, we employ the burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973). *See Mazzeo*, 746 F.3d at 1270; *Sims*, 704 F.3d at 1332.

The first step in that framework is the requirement that the plaintiff make out a prima facie case of age discrimination. A prima facie case requires the plaintiff to demonstrate that: (1) he was between the ages of forty and seventy; (2) he was subject to an adverse employment action—here being fired; (3) a substantially younger person filled the position from which he was discharged; and (4) he was qualified to do the job from which he was terminated. *See Kragor v. Takeda Pharms. Am., Inc.*, 702 F.3d 1304, 1308 (11th Cir. 2012); *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1359 (11th Cir. 1999).

If the plaintiff establishes a prima facie case, the burden of production shifts to the employer to "articulate a legitimate,

20                      Opinion of the Court                      21-13430

nondiscriminatory reason for the challenged employment action."
*Chapman v. AI Transp.*, 229 F.3d 1012, 1024 (11th Cir. 2000); *see
Mazzeo*, 746 F.3d at 1270.  If the defendant does so, the burden shifts
back to the plaintiff to show that the employer's proffered reason
is merely a pretext for discrimination.  *Mazzeo*, 746 F.3d at 1270.

> 2.      Application of *McDonnell-Douglas* Standard to
>         Present Case

Both the magistrate judge and the district court found that
Plaintiff had established a prima facie case of age discrimination,
and we agree.  Plaintiff was fifty-seven years old at the time of his
dismissal, and Defendant's firing of Plaintiff obviously constitutes
an adverse employment action.  Thereafter, a woman in her early
to mid-forties replaced Plaintiff,[9] meaning than Plaintiff's replace-
ment was at least ten years younger than Plaintiff.  Given that dif-
ference in age, Plaintiff's replacement clearly qualifies as being sub-
stantially younger than Plaintiff for purposes of the third require-
ment for a prima facie case.  *See Liebman,* 808 F.3d at 1299 (holding
that a seven-year difference in age qualifies as substantially
younger); *see also Damon*, 196 F.3d at 1360 (a five-year difference
qualifies as substantially younger); *Carter v. DecisionOne Corp.*, 122
F.3d 997, 1003 (11th Cir. 1997) (a three-year difference qualifies as
substantially younger).

---

[9] Fosler testified in 2020 that Plaintiff's replacement, Monica Gray, was in her
mid-40s at the time of the deposition.  As the deposition occurred three years
after Gray took the job, Gray would presumably have been in her early-40s
when she got the promotion.

Finally, as to the fourth requirement for the establishment of a prima facie case, Plaintiff was qualified for the job from which he was terminated.  Plaintiff worked for the DJJ for nearly nineteen years.  *See Liebman*, 808 F.3d at 1299 (inferring that plaintiff was qualified where he had spent twenty-seven years with the company and held his final position for three years).  Further, Fosler testified that Plaintiff and his replacement had "equivalent qualifications" on paper, demonstrating that Plaintiff was qualified for his former position.

Plaintiff having made a prima facie case, the burden of production then shifted to Defendant to articulate and present evidence supporting Defendant's position that it had legitimate, non-discriminatory reasons for firing Plaintiff.  In attempting to shoulder this burden, Defendant introduced the memorandum in support of firing Plaintiff that was drafted by the agency's assistant general counsel purportedly based on representations made by Fosler; documents that Defendant argued supported the decision to fire Plaintiff; and a portion of the deposition testimony of Nierman, the deputy secretary who accepted Fosler's recommendation that Plaintiff be fired.

As Plaintiff has not argued that Defendant failed to meet its burden of production to provide evidence that it had legitimate, non-discriminatory reasons for its decision to fire him, we proceed to the third step of the *McDonnell Douglas* analysis:  the pretext inquiry.  At this step, Plaintiff must demonstrate that a reasonable jury could conclude that Defendant's reasons were a pretext for its

decision to fire Plaintiff and that instead Defendant took this action because of Plaintiff's age.  Our full review of the record persuades us that Plaintiff has met this burden and, accordingly, we conclude that the district court's grant of summary judgment on the age claim should be reversed.  We explain why.

3.    Plaintiff Has Met His Burden to Show a Jury Question as to Pretext

To show pretext, a plaintiff must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Alvarez v. Royal Atl. Devs., Inc.*, 610 F.3d 1253, 1265 (11th Cir. 2010) (quoting *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997)).  Here, quoting from the memorandum prepared by the assistant general counsel at the behest of Fosler, Defendant has asserted that Plaintiff was fired because of poor performance, negligence, inefficiency or inability to perform assigned duties, insubordination, violation of law or agency rules, and conduct unbecoming a public employee.  That same memorandum provided more specificity to the above characterization in stating that (1) staff morale was low due to bullying by Plaintiff; (2) in a dispute with a staff member in 2014 (three years before his termination), Plaintiff  talked over a subordinate; (3) Plaintiff had to be micromanaged because he did not timely address matters or prioritize the needs of facilities; (4) youth have been in confinement in some detention facilities without the appropriate check sheets or staff

nearby; (5) Plaintiff did not accept criticism in a professional manner; and (6) at one center, youths were not kept out of dorm rooms and some of those youths beat up two others.

Almost always in employment discrimination cases, a defendant-employer will not merely offer a conclusory statement as to the reasons for firing an employee, but will also provide some testimony explaining the circumstances that led the employer to believe that termination was necessary. After all, to succeed on its summary judgment motion, an employer-movant has to do more than just articulate; it must also "clearly set forth, through the introduction of admissible evidence, the reasons for [its adverse action against the plaintiff]." *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 255 (1981). Here, it was Fosler who had pushed through the termination of Plaintiff and who had provided the information to counsel that led to issuance of the above-described memo recommending Plaintiff's dismissal. Thus, one would have expected her, when asked, to explain the specific reasons that she had for deciding that Plaintiff had to be fired. Surprisingly, that did not happen here.

Instead, when during her deposition she was asked by Plaintiff's counsel the obvious, and potentially litigation-determinative question, why she had recommended that Plaintiff be fired, Fosler stated that she could not recall. Having asked Fosler to "feel free to share anything with me here," counsel pushed her again on the matter and indicated that he needed to know her reasons, but she

repeated that she did not remember any specifics.[10]  Nor did Defendant subsequently attempt to rehabilitate Fosler's failed memory via an affidavit by Fosler fleshing out with specificity the conduct by Plaintiff that had precipitated Fosler's decision that Plaintiff had to go.

Even assuming that Fosler had adequately spelled out the performance deficiencies on Plaintiff's part that led to her decision to fire him,[11] other parts of her testimony bolster Plaintiff's contention that her reasons are pretextual.  Specifically, Fosler was unable to point to any investigations that had actually found Plaintiff to have bullied or abused his staff.  Indeed, as noted *infra*, there had been investigations following the receipt of anonymous letters and all such investigations exonerated Plaintiff.  Nor was Fosler able to explain why nothing had ever been put into Plaintiff's personnel file documenting that he had regularly bullied his staff, even though she agreed that had this been the case, a "write-up" should have occurred.  Indeed, while Fosler indicated her awareness that over the years some staff had complained that Plaintiff was not nice or was a bully, she thought that all but one of these complaints had occurred before she became Plaintiff's boss.  Further, Fosler did not

---

[10]  As noted *supra*, Fosler answered 71 times that she could not recall in response to questions by counsel.

[11]  Albeit she could not remember why she had sought Plaintiff's dismissal, in response to Plaintiff's counsel's later question whether there had been any issues with Plaintiff's performance, Fosler answered that Plaintiff was considered a bully by staff, that he did not support policy decisions and was difficult to deal with, and that he did not appreciate differing opinions.

believe that she had ever issued a written reprimand against Plaintiff for any reason nor had she ever required him to obtain more management training. Nonetheless, she had felt it appropriate to fire him without first trying interim steps, although she was unable to explain why corrective action as a precursor to termination would not have been appropriate under the circumstances.

In addition, to the extent one could assume that, had she actually responded to counsel's question, Fosler might have said that she sought Plaintiff's termination because of deficient performance on his part, Nierman's testimony gives rise to an inference that such reasons would have been pretextual. As noted, the assistant general counsel's memorandum, which purportedly reflected Fosler's representations, largely based its termination recommendation on allegations of poor performance by Plaintiff. Yet, Nierman's own testimony indicates that, contrary to Defendant's position in this litigation, Plaintiff's termination was not motivated by a determination that he had performed poorly. To repeat, Nierman was the official in the agency who was required to approve Fosler's recommendation that Plaintiff be fired. When asked during his deposition what Fosler's reasons were for wanting to terminate Plaintiff, Nierman deflected the question, indicating that this was a question that counsel should instead ask Fosler. Further, he stated that the information discussed with him centered around an ineffective working relationship between Plaintiff and Fosler and it was his "take" that this was the impetus for Fosler's recommendation. In short, Nierman did not base his acquiescence to Fosler's

recommendation on an assessment that Plaintiff's job performance was poor.

Thus, as to Defendant's position that Plaintiff was fired because of poor job performance, Nierman's testimony demonstrates a weakness, inconsistency, and contradiction as to such an assertion: all characteristics of a pretextual reason. Nor do the documents introduced by Defendant correct those deficiencies in this reason cited by Defendant. For example, in Defendant's motion for summary judgment below, Defendant cited to language in the June 30, 2016 performance review prepared by Fosler indicating that Plaintiff's style of communication with staff had met with resistance and that Plaintiff should try to be more empathetic. That quotation by Defendant is accurate, but selective. The entirety of Fosler's comments are as follows:

> There have been several complaints over this past appraisal period. Mr. Gargett has a more direct management style than most people are probably used to. He does not attempt to be insincere when he deals with staff —meaning he is not fake. This can be interpreted as gruff by staff and probably leaves Mr. Gargett with a bad rap at times. I do encourage him to consider his effect on others and try a different approach.

and

> I respect Mr. Gargett's loyalty and dedication to DJJ. I recommend that he try to embrace a more

empathetic management style as he deals with a diverse team of leaders and staff. He will need to grow this team into one that he can trust and that trust him.

The entirety of these comments do not suggest a problem significant enough to prompt the termination of a long-standing employee. Moreover, Plaintiff's overall rating for this evaluation was 3.8, which put him in the "commendable" range. A commendable score is the second highest rating category.

In that same summary judgment motion, Defendant noted that Plaintiff had been the subject of multiple investigations concerning complaints (most of which were anonymous) that he bullied his employees. Defendant neglects to mention that the conclusion reached by the investigator in each instance was that the particular allegations made against Plaintiff were unsubstantiated or unfounded.

Finally, Defendant points to an incident that occurred on May 1, 2017 in which nine juveniles attacked two other juveniles in a dorm room at one of the six detention centers in Plaintiff's region. There had been an earlier memo directing all DJJ staff across the state to cease housing any more than two juveniles in a room. According to Defendant, this May 1 incident reflected insubordination by Plaintiff in not following a directive. But a reading of the full email chain concerning this incident reveals that Plaintiff promptly inquired of center staff as to what had happened, and he promptly reported back to Fosler that the center's staff stated that due to the large number of intakes that evening, staff felt they had

no alternative as far as housing the youths.  Plaintiff indicated that while he was aware that staff "[was] trying . . . the best they can with what they have," he agreed that "the decision made by the supervisors was inappropriate."

To the extent that Defendant argues that this incident was the reason why Fosler sought Plaintiff's termination, it is important to note that Fosler had initiated termination proceedings against Plaintiff two-three weeks before the May 1 incident.  Nor does the present record warrant an inference that Plaintiff was responsible for what had happened.

In short, Plaintiff has shown that a reasonable jury could conclude that Defendant's contention that it fired Plaintiff because of his poor job performance is pretextual.  That leaves only one other possible legitimate non-discriminatory ground for firing him, and it was the ground that Nierman said the discussion with him centered on:  an ineffective working relationship between Plaintiff and Fosler.  Nierman noted that a person in Plaintiff's particular position served at the pleasure of senior management and because Nierman concluded that the relationship between Plaintiff and Fosler was "broken," Nierman acceded to Fosler's request that Plaintiff be fired.

Yet again, Defendant has offered very little evidence shedding any light on how this ineffectiveness manifested itself or how exactly Plaintiff contributed to the disharmony.  And without some testimony providing context for the reason for the broken relationship, it is impossible to know whether the relationship was

impaired because of Fosler's alleged bias against older workers or because of other factors. Certainly, Nierman did not indicate that he faulted Plaintiff for the broken relationship. And without any elaboration or particular examples, the most we get from Fosler on this record is a general statement that Plaintiff did not agree with moving the department forward in terms of policy and that Plaintiff "disrupted channels of leadership." All of which leaves us with little more than the conclusion that, for reasons not specifically fleshed out in this litigation, Fosler wanted Plaintiff gone. Yet, given evidence of her multiple statements indicating a bias against older workers and a desire to have younger employees, a jury, on this record, could conclude that her real reason for wanting Plaintiff fired was his age. This being so, Plaintiff has demonstrated a question of fact as to whether Defendant's reasons for discharging him were pretextual, summary judgment on the age discrimination claim should have been denied by the district court, and we therefore reverse the district court's grant of summary judgment on this claim.

### C.    ADEA and FCRA Retaliation Claims[12]

As to his retaliation claim, Plaintiff argues that, in response to his January 2016 memo to Fosler expressing concern that Fosler's hostility against him was because of his age, Fosler

---

[12] The elements of retaliation under the FCRA and the ADEA are the same. *See Drago v. Jenne*, 453 F.3d 1301, 1307 (11th Cir. 2006).

retaliated against him by temporarily reassigning him to replace the recently departed director of detention services in South Florida.

The *McDonnell Douglas* burden-shifting framework also applies to retaliation claims, and plaintiffs "alleging retaliation must establish a prima facie case by showing: (1) a statutorily protected expression, (2) an adverse employment action, and (3) a causal link between the protected expression and the adverse action." *Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913, 919 (11th Cir. 1993) (citing *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993) (footnote omitted)). Plaintiff asserts that his January 2016 email to Fosler, in which he wondered whether her issues with him were related to his performance or rooted in age or gender discrimination, was a statutorily-protected expression. Meanwhile, Plaintiff asserts that his temporary reassignment to Miami shortly after his email to Fosler was an adverse employment action. To support a causal link between the protected expression and the adverse action, Plaintiff notes the close temporal proximity between his email to Fosler and his temporary reassignment to Miami.

While we will assume that Plaintiff's January 2016 email to Fosler constituted a statutorily protected expression, we cannot conclude that Fosler temporarily reassigning him to Miami constituted a materially adverse employment action. *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (providing that a materially adverse action is one that "well might have dissuaded a reasonable worker from making or supporting a charge of

21-13430                Opinion of the Court                31

discrimination") (quotation marks omitted).[13]  "Whether a partic-
ular reassignment is materially adverse depends upon the circum-
stances of the particular case, and 'should be judged from the per-
spective of a reasonable person in the plaintiff's position, consider-
ing all the circumstances.'"  *Id.* at 70–71 (quoting *Oncale v. Sun-
downer Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998)).

　　Simply put, we agree with the magistrate judge and the dis-
trict court that this temporary eight-week reassignment could not
plausibly constitute an adverse employment action.  Fosler had to
send someone in to fill the Southern District vacancy, as its director
of detention services had recently resigned on apparently short no-
tice.  Likely few people would be excited at the prospect of uproot-
ing themselves, even for a short period of time.  Yet, the DJJ duly
compensated Plaintiff for any financial expenses by putting him up
in a hotel and providing a daily per diem for food.  Further, at the
end of the temporary reassignment, Fosler conferred an award on
Plaintiff based on the teamwork and cooperative spirit he exhibited
in handling well his duties as the temporary director of the South-
ern District.  And of course Plaintiff was permitted to return to his
regular duties in his own region after eight weeks.  Nothing about
the circumstances surrounding this temporary reassignment sug-
gests that it was less prestigious or desirable than Plaintiff's normal
role.  *See Burlington*, 548 U.S. at 71 (concluding that, where the

---

[13]  While *Burlington* addressed retaliation in the Title VII context, we have
adapted the principles of law applicable to Title VII retaliation cases to retali-
ation claims under the ADEA.  *See Hairston*, 9 F.3d at 919.

evidence showed that the plaintiff's reassignment consisted of "more arduous and dirtier" duties and the job was less prestigious and desirable, a jury could reasonably conclude that the reassignment of responsibilities was materially adverse to a reasonable employee) (quotation marks omitted). To the contrary, one could reasonably view the temporary reassignment as a show of confidence in Plaintiff. And, as noted, he received an award and kudos based on the exemplary way that he handled his temporary duties.

Accordingly, we conclude that that the temporary reassignment here was not an adverse employment action nor an action that might have dissuaded a reasonable worker in Plaintiff's position from expressing a concern about possible discrimination. That being so, Plaintiff has failed to establish a prima facie case of retaliation and we therefore affirm the district court's grant of summary judgment in favor of the DJJ on the retaliation claims.

### D.    FMLA Interference Claim[14]

Plaintiff argues that the DJJ interfered with his FMLA rights by denying his second FMLA leave request based on the fact that it had fired Plaintiff. To establish that an employer interfered with his FMLA rights, an employee must show by a preponderance of the evidence that he was entitled to the benefit that his employer

---

[14] Plaintiff alleged a retaliation claim under the FMLA in his Complaint, but he failed to pursue that claim in subsequent briefing and has abandoned it on appeal.

denied. *Matamoros v. Broward Sheriff's Off.*, 2 F.4th 1329, 1338 (11th Cir. 2021).

Plaintiff's argument concerning this claim is incoherent. As set out above, following Nierman's authorization of Fosler's request to remove Plaintiff from his director's position and during the time-period Nierman was attempting to find a new position for Plaintiff, Plaintiff requested and received some FMLA leave for biceps surgery. So, there was no FMLA violation as to Plaintiff's first request for FMLA leave. Subsequently, he had requested FMLA leave for a second surgery that he needed to have, but prior to the date of this intended second surgery, he was formally terminated by Defendant.

The FMLA gives an employee the opportunity to take a certain amount of leave based on illness, without fear that the employee will be fired for taking the leave. Obviously, an employee, like Plaintiff, who no longer works for an employer will no longer need FMLA leave for a future illness because there is no fear of being fired from a job one does not have.

To the extent that one might inquire whether Plaintiff was basing his FMLA-interference claim on an argument that he was terminated for requesting a second FMLA leave, that argument would make no sense under these facts. "[T]he right to commence FMLA leave is not absolute," and an employer can dismiss an employee, preventing him from exercising his right to commence FMLA leave, "without thereby violating the FMLA, if the employee would have been dismissed regardless of any request for

FMLA leave." *Krutzig v. Pulte Home Corp.*, 602 F.3d 1231, 1236 (11th Cir. 2010); *see also Spakes v. Broward Cnty. Sheriff's Off.*, 631 F.3d 1307, 1310 (11th Cir. 2011). Thus, for an employer to be held liable for FMLA interference, the request for leave must have been the proximate cause of the termination. *Schaaf v. Smithkline Beecham Corp.*, 602 F.3d 1236, 1242 (11th Cir. 2010).

But, of course, on these facts and on his own theory of his main claim in the case—the age discrimination claim—Plaintiff lacks any plausible argument that Defendant fired him because he requested a second period of leave. As noted above, Defendant was willing to keep Plaintiff in its employ so long as Plaintiff accepted a different, lesser position. It was Plaintiff's decision to reject that offer and Defendant's decision that Plaintiff could no longer continue as a director that led to his ultimate termination. In offering Plaintiff a different position, Defendant was of course aware that it would be obliged to provide him with any remaining period of FMLA leave that he was entitled to, and it was willing to do so. Thus, Plaintiff's request for a second period of FMLA leave had no impact on Defendant's decision to fire him. It was Defendant's decision to remove Plaintiff from his present position and Plaintiff's refusal to accept a demotion to another position that led to that action.[15]

---

[15] We have concluded that a plaintiff who failed to present evidence from which a reasonable jury could find that an employer's proffered reasons were pretextual with respect to an ADA claim had "[f]or the same reasons" failed to present evidence of a causal connection in her FMLA interference claim. *Wascura v. City of S. Miami*, 257 F.3d 1238, 1248 (11th Cir. 2001). We apply the law

Moreover, Plaintiff's primary claim in this case is his age discrimination claim. As noted, Plaintiff must prove that but for his age, Defendant would not have removed him from his director position. But any argument by Plaintiff that a second reason why Defendant terminated him was Plaintiff's request for a second period of FMLA leave is an argument that would seem to greatly diminish his claim that age was the "but-for" reason for his termination. Thus, we do not infer him to be making that argument. In short, Plaintiff's FMLA claim, which is quite difficult to decipher, is without merit.

Accordingly, we affirm the district court's grant of summary judgment to Defendant as to Plaintiff's FMLA interference claim.

## IV.    CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's grant of summary judgment in favor of the Defendant-Appellee DJJ as to Plaintiff's retaliation and FMLA claims, but we **REVERSE** its grant of summary judgment on Plaintiff's age-discrimination claims. The Defendant-Appellee DJJ's motion for leave to file a corrected brief is **GRANTED**.

---

developed in Title VII, ADEA, and ADA cases interchangeably. *See Pennington v. City of Huntsville*, 261 F.3d 1262, 1269 (11th Cir. 2001); *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1287 (11th Cir. 1997); *Hairston*, 9 F.3d at 919.